UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CIVIL DIVISION

CASE NUMBER

**00-6729**

**ICIV-MORENO**

FILED by _____ D.C.

MAY 31 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

**STANLEY STIRZAKER** and **NORMA STIRZAKER**,

      Plaintiffs,

vs.

**TIMOTHY P. HOWARD** and **HOWARD & ASSOCIATES, ATTORNEYS AT LAW, P.A.**,

      Defendants.

_____/

MAGISTRATE JUDGE
DUBÉ

## VERIFIED COMPLAINT FOR ATTORNEY MALPRACTICE

The plaintiffs, Stanley Stirzaker and Norma Stirzaker (hereafter "Plaintiffs"), by and through their undersigned counsel, sue the defendants, Timothy P. Howard, individually, and Howard & Associates, Attorneys at Law, P.A., jointly and severally, and allege as follows:

### JURISDICTION AND VENUE

1.    This action is of a civil nature involving, exclusive of interest, costs, and attorney's fees, a sum in excess of seventy-five thousand dollars ($75,000).

2.    This action and claim arose in Broward County, Florida.

3.    Stanley Stirzaker is, and was at all times material



hereto, a citizen of the United Kingdom.

4.   Norma Stirzaker is, and was at all times material hereto, a citizen of the United Kingdom.

5.   Timothy P. Howard (hereafter "Howard") is, and was at all times material hereto, a citizen of the state of Florida.

6.   Upon information and belief, Howard & Associates, Attorneys at Law, P.A., (hereafter the "Firm") is a professional partnership of lawyers organized and existing under the laws of the State of Florida.

7.   Upon information and belief, at all times material hereto, the Firm is and was authorized to, and did, do business in the State of Florida.

8.   Every issue of fact and law is wholly between citizens of the state of Florida and citizens or subjects of a foreign state.

9.   This Court therefore has "alienage" jurisdiction under 28 U.S.C. § 1332(a), due to the diversity of citizenship of the parties.

10.   At all times material hereto, Howard was authorized to do, and did, business in Broward County.

11.   At all times material hereto, the Firm was engaged in the business of providing legal services to the general public in Broward County.

12.   Upon information and belief, at all times material hereto, the Firm was licensed to do business in Broward County.

13.   At all times material hereto, the Firm did business in

- 2 -

Broward County.

14. At all times material hereto, the Firm maintained an office in Broward County, for the purpose of practicing law.

15. At all times material hereto, the Firm maintained a business office in this judicial district and Howard practiced law in this judicial district.

16. At all times material hereto, Defendants had significant contacts with Broward County.

17. The majority of Plaintiffs' communications with Defendants took place with Defendants' Broward County office.

18. In addition, Plaintiffs' files were maintained in Defendants' Broward County office.

19. Defendants, acting from their Broward County office, acted to represent Plaintiffs without the reasonable care, skill, and diligence ordinarily possessed and exercised by other attorneys in the community in similar circumstances.

20. Defendants, acting from their Broward County office, failed and omitted to represent Plaintiffs with the reasonable care, skill, and diligence ordinarily possessed and exercised by other attorneys in the community in similar circumstances.

21. Defendants, acting from their Broward County office, breached their fiduciary duty to Plaintiffs.

22. Defendants, acting from their Broward County office, breached their agreement to provide legal services to Plaintiffs.

23. This judicial district, which includes Broward County,

was the judicial district where a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred.

24.   Plaintiffs' causes of action against Defendants therefore accrued in Broward County.

25.   Venue is thus properly laid in this Court pursuant to 28 U.S.C. § 1391.

### BACKGROUND

On or about July 1, 1993, David B. Lee, Jr., Esq., of Lee, Hallowes, Green & Luke, instituted, on Plaintiffs' behalf, an action for legal malpractice, fraud, misrepresentation, and conspiracy to defraud.   The claims for legal malpractice were against Kurt A. Simpson and Kurt A. Simpson, P.A. (hereafter collectively "Simpson"); the remaining claims were against Jimmy and Nancy Laughren (hereafter collectively the "Laughrens"), Arvida Realty Sales, Stockton Land Corporation, and Fred L. Ahern, Jr. (hereafter "Ahern").  The malpractice claims against Simpson shall be hereafter referred to as the "Simpson Malpractice Case").   The facts and circumstances of the Simpson Malpractice Case are included in the outline attached hereto and incorporated herein as exhibit A.

In the course of the Simpson Malpractice Case, Attorney Lee signed a stipulation dismissing one defendant and filed nothing in opposition to the motions for summary judgment of two others.   In July of 1994, within two years (the applicable statute of limitations for legal malpractice) of Plaintiffs' retention of

- 4 -

Howard and the Firm, Attorney Lee and his firm withdrew. Plaintiffs hired another Jacksonville attorney, Mark G. Pennington, Esq., who represented Plaintiffs for a brief four month period, whereupon, in December 1994, Plaintiffs retained Michael D. Towner, Esq. (hereafter "Towner") of Broward County.

On or about March 1995, the parties attended mediation, at which time Plaintiffs first learned that the two corporate defendants had been let out of the litigation. Thereafter, Plaintiffs repeatedly asked Towner to arrange a court date. On or about November 1995, Towner called and said he had lost his license to practice law. On or about January 1996, Towner directed Plaintiffs to the Florida Bar referral service, which referred Plaintiffs to Defendants. Defendants took over Towner's existing Broward County office and law practice, thus Plaintiffs continued their communications with Broward County, as commenced with Towner. Shortly thereafter, in February 1996, the amount of Plaintiffs' damages from the Laughrens was established in the amount of approximately $346,000, together with interest, costs, and attorney's fees. Moreover, Plaintiffs also provided Defendants with a copy of the probate file for Jimmy Laughren's late father, reflecting sums due Jimmy Laughren thereto.

### ALLEGATIONS COMMON TO ALL COUNTS

26. At all times material hereto, Howard held himself out to the public as possessing greater than ordinary knowledge and skill in the field of legal malpractice.

- 5 -

27.   As a result, Howard had a duty to represent Plaintiffs with the reasonable care, skill, and diligence ordinarily possessed and exercised by attorneys specializing in the fields of legal malpractice.

28.   Howard also had a duty to adequately supervise the Firm's employees while acting in the scope of their employment by the Firm.

29.   At all times material hereto, the Firm held itself out to the public as possessing greater than ordinary knowledge and skill in the field of legal malpractice.

30.   As a result, the Firm had a duty to represent Plaintiffs with the reasonable care, skill, and diligence ordinarily possessed and exercised by attorneys specializing in the field of legal malpractice.

31.   The Firm also had a duty to adequately supervise its employees while acting in the scope of their employment by the Firm.

32.   At all times material hereto, Howard was an attorney duly authorized to practice law in the State of Florida.

33.   Upon information and belief, Towner was at all times material hereto a resident of Broward County.

34.   Upon information and belief, Towner was at certain times material hereto an attorney duly authorized to practice law in the State of Florida.

35.   Upon information and belief, Towner was at all times

- 6 -

material hereto employed by the Firm.

36. Upon information and belief, Jorge Cruz-Bustillo (hereafter "Cruz-Bustillo") was at all times material hereto an attorney duly authorized to practice law in the State of Florida.

37. Upon information and belief, Cruz-Bustillo was at all times material hereto employed by the Firm.

38. At all times material hereto, Howard, Towner, and Cruz-Bastillo were members (partners) and/or employees of the Firm; Howard and Cruz-Bastillo were practicing law in and for the Firm. The Firm and Howard will hereafter collectively be referred to as "Defendants."

39. Plaintiffs contacted the Florida Bar Lawyer Referral Service to obtain an attorney specializing in legal malpractice.

40. The Florida Bar Lawyer Referral Service recommended Defendants to Plaintiffs.

41. Defendants also expressly represented to Plaintiffs that they had successfully prosecuted legal malpractice actions against other Jacksonville attorneys (Simpson practiced law in Jacksonville).

42. On or about January 1996, Plaintiffs entered into an agreement with Defendants to provide legal services to Plaintiffs (the "Agreement"). A copy of the Agreement is attached hereto and incorporated herein as exhibit B.

43. Plaintiffs' retention of Howard and/or any other attorney of the Firm is a retention of the Firm, thus, the Firm is

- 7 -

responsible for the acts, errors, and omissions of Howard and/or any other attorney in connection with legal services rendered to Plaintiffs.

44.  Pursuant to the terms of the Agreement, Defendants agreed to represent Plaintiffs' interests, including, but not limited to, all matters pertaining to the legal malpractice action against Simpson.

45.  Defendants also assumed the responsibility to represent Plaintiffs in the subsequent bankruptcy of Jimmy and Nancy Laughren.

46.  Pursuant to the terms of the Agreement and as a result of the attorney-client relationship created thereby, Defendants had a duty to represent Plaintiffs with the reasonable care, skill, and diligence ordinarily possessed and exercised by other attorneys in the community in similar circumstances, together with the enhanced duty in the specialized area heretofore set forth.

47.  On or about February 14, 1996, Defendants imposed upon Plaintiffs a change in the Agreement.

48.  Specifically, Defendants learned that Plaintiffs would be receiving approximately $39,000 from the closing of 9486 Preston Trail West (hereafter "PTW"), the real property transaction which underpinned the malpractice action against Simpson.

49.  Defendants told Plaintiffs that they [Plaintiffs] must either change the Agreement from a contingency to an hourly agreement or Defendants would withdraw; Plaintiffs reluctantly

- 8 -

agreed.   A copy of the February 14, 1996 letter reflecting the
change to the Agreement is attached hereto and incorporated herein
as exhibit C.

     **I.   Malpractice regarding Simpson Malpractice Action**

     50.   On April 10, 1996, the St. Johns County Circuit Court in
the Simpson Malpractice Case (hereafter the "Civil Court")
scheduled a July 30, 1996 pretrial conference.

     51.   At no time did Defendants depose Jimmy Laughren and Nancy
Laughren.

     52.   The Laughrens were the owners and sellers of PTW, for
which sale Plaintiffs were represented by Simpson.

     53.   The Laughrens defrauded Plaintiffs in the PTW sale.

     54.   Plaintiffs also contend the Laughrens filed bankruptcy in
bad faith, causing Plaintiffs further damage.

     55.   Defendants noticed the deposition of Ahern, the
Laughrens's attorney, who was involved in the negotiations for the
PTW purchase with Simpson; Ahern was also an agent for Commonwealth
Land Title Insurance.

     56.   However, Defendants did not take Ahern's deposition,
despite Ahern not having obtained a protective order thereto.

     57.   On May 15, 1996, Defendants deposed Simpson.

     58.   As part of the deposition, Simpson produced his office
file, which Plaintiffs contend prove that Simpson made
misrepresentations to the Florida Bar, including, but not limited
to: (a) not having represented Plaintiffs for their visas; (b) the

- 9 -

time at which Simpson referred Plaintiffs to qualified immigration counsel; (c) that Plaintiffs were represented in the Florida real estate purchase negotiations by their English attorney; (d) that Plaintiffs had not sought a home inspection for PTW; and, (e) the dates when Simpson said Plaintiffs were in Florida inspecting PTW.

59.   Prior to Simpson's deposition, Plaintiffs had furnished Defendants with "their half" of the 1992 communications between themselves and Simpson, which, together with the contents of Simpson's files, demonstrated additional support for the Simpson Malpractice Case.

60.   During Simpson's deposition, Simpson's attorney withheld one exhibit, Exhibit 21, which Plaintiffs believe also demonstrated Simpson's malpractice; moreover, the Civil Court reporter's index confirms same.

61.   Following Simpson's deposition, Defendants confirmed their recognition of the importance of the documents produced at the deposition by instructing Plaintiffs, <u>Defendants' clients, who were non-lawyers</u>, to prepare affidavits introducing "their half" of the 1992 communications between themselves and Simpson, instead of preparing same themselves or having the Firm [his office] do so.

62.   Plaintiffs prepared two affidavits which they faxed to Defendants.

63.   Defendants typed one affidavit (of plaintiff, Norma Stirzaker), and faxed it back to Plaintiffs.

64.   Defendants instructed Plaintiffs to make several copies

- 10 -

of that affidavit, together with twenty-two of the available exhibits documenting Simpson's malpractice, to deliver a copy of the affidavit and exhibits to Simpson, and to file a copy including exhibits with the Civil Court by 5:00 p.m. on May 22, 1996.

65.   Plaintiffs later learned that Defendants filed a motion for punitive damages on the same day, May 22, 1996, which referred to Norma Stirzaker's affidavit and exhibits.

66.   On June 7, 1996, Plaintiffs attended the 10:00 a.m. preliminary conference to the July 30, 1996 pretrial conference.

67.   At 10:20 a.m. on June 7, 1996, Nancy Laughren presented the Civil Court with a document confirming that the Laughrens had, at 9:49 a.m., filed Chapter 13 bankruptcy; pursuant to applicable automatic stay provisions, the Civil Court bifurcated the case.

68.   On July 8, 1996, Simpson submitted his motion for summary judgment in the Simpson Malpractice Case.

69.   On July 9, 1996, Simpson noticed his motion for summary judgment for hearing on July 30, 1996, the day of the pretrial conference.

70.   On July 12, 1996, Defendants filed a memorandum in opposition to Simpson's motion for summary judgment.

71.   While Defendants's memorandum in opposition to Simpson's motion for summary judgment referred to their motion for punitive damages and Norma Stirzaker's affidavit and supporting documentation, Defendants did not timely file any affidavits in opposition to Simpson's motion for summary judgment.

72.   On July 30, 1996, Defendants appeared at the Civil Court with a banker's box containing one hundred thirty-four (134) documents supporting Plaintiffs' position; none of the documents were filed or referred to at the hearing.

73.   Defendants did not obtain a court reporter for the July 30 hearing.

74.   Defendants did not seek a continuance of the summary judgment hearing nor an extension of time in order to properly respond to Simpson's motion for summary judgment.

75.   The hearing lasted less than fifteen (15) minutes.

76.   Defendants' time records confirm that Defendants were "completing [their] summary judgment response" on August 1, 1996, two days <u>after</u> the summary judgment hearing.

77.   On August 1, 1996, Defendants untimely served Plaintiffs' Supplemental Memorandum of Law and Evidence in Support of Plaintiffs Opposition to [Simpson's] Motion for Summary Judgment; moreover, Defendants did not move to have the affidavit deemed timely filed.

78.   The August 1 Supplemental Memorandum included evidence to refute Simpson's Motion for Summary Judgment and to prove Plaintiffs' case against Simpson.

79.   On August 1, Defendants untimely filed the transcript of Simpson's May 15, 1996 deposition; moreover, Defendants did not move to have the affidavit deemed timely filed.

80.   Simpson's deposition transcript and accompanying exhibits

- 12 -

included evidence to refute Simpson's Motion for Summary Judgment and to prove Plaintiffs' case against Simpson.

81.  On August 2, Defendants untimely filed the affidavit of real estate expert witness Joseph Boyd; moreover, Defendants did not move to have the affidavit deemed timely filed.

82.  Boyd's affidavit included evidence to refute Simpson's Motion for Summary Judgment and to prove Plaintiffs' case against Simpson.

83.  On August 1, Defendants untimely filed the transcript of the June 26, 1996 transatlantic deposition of English attorney Peter Wise; moreover, Defendants did not move to have the transcript deemed timely filed.

84.  Wise's deposition transcript included evidence to refute Simpson's Motion for Summary Judgment and to prove Plaintiffs' case against Simpson.

85.  On August 1, Defendants filed, for the second time, Norma Stirzaker's May 22, 1996 affidavit and twenty-two (22) supporting documents.

86.  On August 1, Defendants untimely filed the transcript of Ahern's June 7, 1994 testimony to the Florida Bar; moreover, Defendants did not move to have the transcript deemed timely filed.

87.  Ahern's Florida Bar transcript included evidence to refute Simpson's Motion for Summary Judgment and to prove Plaintiffs' case against Simpson.

88.  Defendants failed to file Ahern's May 12, 1993 letter to

- 13 -

the Florida Bar.

89.  Ahern's May 12, 1993 letter to the Florida Bar included evidence to refute Simpson's Motion for Summary Judgment and to prove Plaintiffs' case against Simpson.

90.  On August 5, 1996, Simpson filed his motion to strike Plaintiffs [August 1, 1996] Supplemental Memorandum of Law and Evidence in Support of [Plaintiffs'] Opposition to [Simpson's] Motion for Summary Judgment; on August 7, that motion was granted.

91.  On August 7, 1996, the Civil Court entered its order granting Simpson's motion for summary judgment.

92.  Evidence in Defendants' possession or as to which they were aware, including, but not limited to the foregoing untimely filings and as set forth in exhibit A hereto, would have defeated Simpson's motion for summary judgment and proven Plaintiffs' case against Simpson.

93.  Regardless, Defendants did not seek rehearing of the order granting Simpson's motion for summary judgment.

94.  On August 8, Defendants served Plaintiffs' Memorandum in Support of Motion to Compel Production of [Simpson's] Telephone Records.

95.  On August 9, Defendants filed Plaintiffs' witness list, joint pretrial statement, joint pretrial compliance and exhibit list.

96.  On August 12, Defendants filed a Supplement to Plaintiffs' Exhibit List.

- 14 -

97.   On August 13, Defendants faxed to Plaintiffs the order granting Simpson's motion for summary judgment.

98.   Defendants' cover letter included that they would appeal the decision and that "[o]ther pieces of evidence we had would have been cumulative to the affidavit [of Norma Stirzaker] and 22 documents submitted already."

99.   This was despite the fact Defendants had already untimely refiled the affidavit of Norma Stirzaker and 22 supporting documents.

100.   Defendants assured Plaintiffs the appeal would be successful.

101.   On November 14, 1996, Defendants wrote to Simpson's counsel seeking Exhibit 21 from Simpson's deposition, which was withheld at that deposition.

102.   To that point, Defendants had apparently done nothing to obtain this important exhibit.

103.   On November 14, 1996, Simpson's counsel wrote back to Defendants saying he would try to locate Exhibit 21.

104.   However, to Plaintiffs' knowledge, Exhibit 21 was never produced and Defendants made no further attempts to obtain it.

105.   On December 11, 1996, Simpson moved to strike portions of Plaintiffs' initial brief as beyond the record on appeal.

106.   Simpson's motion included that Defendants:

- 15 -

> made no request to file a supplemental
> memorandum, or to file additional evidence, or
> to continue the hearing on a later date. Nor
> did counsel file a motion for rehearing, and
> attempt to introduce additional evidence on
> rehearing.

107.    Simpson's motion was granted.

108.    On August 29, 1997, the appellate court issued an order to show cause directed to Defendants, for reasons including "Counsel's failure to follow the appellate rules."

109.    The results of Defendants' failures included the striking of Plaintiffs' reply brief; it was later reinstated.

110.    Defendants continued to assure Plaintiffs that the appeal would be successful.

111.    On December 9, 1997, the automatic stay in bankruptcy having been lifted for that purpose, the Civil Court entered its order granting Plaintiffs' claims against the Laughrens. *See also infra* at II.

112.    Through counsel, except for their unsuccessful July 1, 1997 motion to dismiss, the Laughrens filed no paper in opposition, and had no objection, to entry of a default judgment against them.

113.    The Civil Court found the Laughrens had committed fraud by knowing and intentional misrepresentations.

114.    The Civil Court found the Laughrens had conspired to commit fraud by knowing and intentional misrepresentations.

115.    The Civil Court reserved jurisdiction to award

punitive damages and attorney's fees against the Laughrens and in Plaintiffs' favor.

116.     On April 29, 1998, the Civil Court entered a judgment against the Laughrens and in favor of Plaintiffs for $350,090 and 07/100, plus interest at 18% per annum.

117.     Despite the fact that the judgment against the Laughrens was <u>fully dischargeable</u> in their Chapter 13 bankruptcy, due to the damages, including any punitive and/or other damages, arising from fraud, on January 22, 1998, Defendants faxed the judgment to Plaintiffs; the cover sheet reflected "You won!! Celebrate!"

118.     In mid-June, 1998, Defendants telephoned Plaintiffs to advise that the appellate court had issued a "PCA" which meant Plaintiffs had lost the appeal, but without explanation.

119.     Defendants did not provide a copy of the decision to Plaintiffs.

120.     Plaintiffs later learned the *per curiam* affirmance was issued June 9, 1998.

121.     Defendants told Plaintiffs they [Defendants] would seek clarification of the PCA affirmance.

122.     On June 23, 1998, Defendants filed their motion to the Fifth District Court of Appeal for Rehearing and Clarification.

123.     On June 29, 1998, Simpson moved for Plaintiffs' motion for rehearing to be denied; on July 9, 1998, rehearing was denied.  The Fifth District's mandate issued July 28, 1998.

- 17 -

124.    Sometime shortly after September 9, 1998, one of Plaintiffs' former attorneys, Borden Hallowes, Esq., arranged for Plaintiffs to meet with a Jacksonville bankruptcy attorney, Jim Post, Esq., of Smith, Hulsey & Busey.

125.    Attorney Post gave Plaintiffs materials including a copy of Florida Rule of Civil Procedure 1.540, to be used against Simpson.

126.    Plaintiffs faxed the materials including Florida Rule of Civil Procedure 1.540 to Defendants.

127.    Defendants told Plaintiffs, Defendants' clients, who were non-lawyers, that they [Plaintiffs] could submit a 1.540 motion at any time.

128.    Defendants did not prepare or file a 1.540 motion on Plaintiffs' behalf.

129.    Defendants also did not take any steps to timely investigate and/or pursue claims for legal malpractice against any of the attorneys who had represented Plaintiffs since Simpson.

130.    Plaintiffs learned of the denial early in 1999; Defendants did not inform Plaintiffs either of the denial of the motion for rehearing or of the receipt of the mandate.

131.    On January 9, 1999, six months after the June 9, 1998 opinion, Defendants forwarded to Plaintiffs twenty-six documents including Defendants' June 23, 1998 motion for rehearing and clarification.

132.    On April 8, 1999, Plaintiffs wrote to Defendants

- 18 -

asking about the status of the appeal against Simpson; Defendants failed to respond.

133.     Defendants had not advised Plaintiffs of the effect of the PCA opinion.

134.     If Defendants had exercised the reasonable care, skill, and diligence ordinarily possessed and exercised by other attorneys in the community in similar circumstances, together with employing the evidence in Defendants' possession or as to which they were aware, including, but not limited to the foregoing untimely filings and as set forth in exhibit A hereto, and with other discovery as authorized and appropriate, Plaintiffs would have defeated Simpson's motion for summary judgment and proven their case against Simpson for legal malpractice.

135.     Moreover, Defendants' failure caused Plaintiffs damage including, but not limited to, the amounts Plaintiffs did not recover in the Simpson Malpractice Case and the amounts which may have been recoverable from the other attorneys who represented Plaintiffs in the Simpson Malpractice Case prior to Defendants, together with all the attorney's fees and costs incurred thereto.

## II.  Malpractice regarding Laughren bankruptcy

136.     The July 1, 1993, lawsuit filed on Plaintiffs' behalf included counts for fraud, misrepresentation, and conspiracy to defraud against parties including Jimmy and Nancy Laughren.

137.     The claims against the Laughrens detailed how the Laughrens had wilfully misrepresented the condition of PTW (see

- 19 -

Simpson Malpractice Case Outline), and had thus defrauded Plaintiffs of substantial sums, in excess of $340,000.

138.      The Laughrens filed Chapter 13 bankruptcy on June 7, 1996 (hereafter the "Laughren Bankruptcy").

139.      Prior to that time, Defendants knew that Plaintiffs had incurred damages of approximately $346,000, together with interest, costs, and attorney's fees.

140.      This knowledge was reflected in Plaintiffs' claim against the Laughren Bankruptcy Estate of said $346,000.

141.      Plaintiffs had information, which they passed on to Defendants, that the Laughren Bankruptcy was filed in bad faith from the inception.

142.      As Plaintiffs' current bankruptcy counsel advised them, the Laughren Bankruptcy was dismissed on July 12, 1996 and amended July 25, 1996 for failure to file a plan.

143.      Defendants took no action regarding the dismissal or amendment of the plan.

144.      Moreover, even if Defendants claimed to have received no direct notice of these actions, the "PACER" court access system would have alerted Defendants.

145.      A confirmation hearing on the Laughren Bankruptcy was scheduled for February 4, 1997.

146.      The hearing was continued to April 1, 1997.

147.      Defendants did not file a motion to dismiss the bankruptcy for any reasons, including bad faith filing, prior to

the hearing.

148.     Defendants did not file any objections to the
Laughrens' proposed plan either prior to or after the hearing,
despite: (a) Plaintiffs having advised Defendants that the plan did
not submit all of the Laughrens' disposable income for at least
three years; (b) the fact the plan did not pay to unsecured
creditors, like Plaintiffs, an amount they would have received
under a Chapter 7 bankruptcy; and, (c) the serious questions raised
as to the motivations of the Laughrens and their sincerity in
seeking relief under the provisions of Chapter 13.

149.     Defendants did not file any objections to the
Laughrens' exemption schedules either prior to or after the
hearing, despite: (a) Plaintiffs having advised Defendants that
proceeds of the Laughrens' fraud were traceable directly to the
Laughrens' claimed homestead exemption; and, (b) the Laughrens not
having claimed the total equity of their homestead property as
exempt.

150.     In addition, Defendants were on notice, in answers
to requests for admission provided in early February 1997, that, on
the same day the bankruptcy was filed, there was a disclaimer of an
interest that Jimmy Laughren had in the estate of his father in the
approximate amount of one hundred forty-seven thousand five hundred
sixteen dollars and 23/100 ($147,516.23).

151.     On April 1, 1997, Defendants sent Cruz-Bustillo,
their newly-appointed associate, to represent Plaintiffs at the

- 21 -

hearing for confirmation and to lift stay.

152.     Cruz-Bustillo had no bankruptcy experience.

153.     Cruz-Bustillo told Plaintiffs he knew nothing about
the Civil Court Case, despite the fact the Civil Court Case
included claims against the Laughrens.

154.     Cruz-Bustillo was also wholly unfamiliar with the
facts and circumstances of and surrounding the Laughren Bankruptcy.

155.     For reasons including Cruz-Bustillo's lack of
experience and knowledge, Plaintiffs' position was not presented to
the bankruptcy court, and the bankruptcy court's findings of fact
so reflected.

156.     On April 10, 1997, the bankruptcy court granted
relief from stay pursuant to the motion filed by Defendants on
Plaintiffs' behalf.

157.     The order confirming the plan was entered May 27,
1997.

158.     On September 9, 1998, more than a year after
confirmation, Defendants attempted to present a motion to dismiss
the Laughren Bankruptcy on Plaintiffs' behalf.

159.     However, Defendants did not notify the other
creditors about their proposed motion, so they were denied
permission to address the bankruptcy court.

160.     Shortly thereafter, one of Plaintiffs' former
attorneys arranged for Plaintiffs to meet with a Jacksonville
bankruptcy attorney, Jim Post, of Smith, Hulsey & Busey.

161.     Attorney Post gave Plaintiffs materials including case law on bad faith filing, to be used against the Laughrens in the bankruptcy court.

162.     Plaintiffs faxed the case law on bad faith bankruptcy filing to Defendants.

163.     Following that unsuccessful attempt, Defendants told Plaintiffs that they would submit a new motion to dismiss the Laughren Bankruptcy for bad faith filing.

164.     Defendants also told Plaintiffs they would include with this motion to dismiss for bad faith filing the case law from attorney Post.

165.     On December 1, 1998, despite the Laughren Bankruptcy confirmation hearing having taken place some eighteen months earlier, Defendants wrote to Plaintiffs advising that Defendants were now working on a motion to dismiss the Laughren Bankruptcy.

166.     No such motion was ever filed.

167.     If Defendants had exercised the reasonable care, skill, and diligence ordinarily possessed and exercised by other attorneys in the community in similar circumstances, Plaintiffs would have recovered moneys from the Laughrens in the Laughren Bankruptcy and would not have unnecessarily expended moneys in the Laughren Bankruptcy.

168.     Moreover, Defendants' failure caused Plaintiffs damage including, but not limited to, the amounts Plaintiffs did not recover in the Laughren Bankruptcy, together with all the

attorney's fees and costs incurred thereto.

169.    On May 17, 1999, Defendants wrote to Plaintiffs advising they were withdrawing as Plaintiffs' counsel.

170.    Plaintiffs did not receive a motion to withdraw from Defendants.

171.    Plaintiffs did not receive an order on a motion to withdraw from Defendants.

### Summary

172.    By these and other acts and omissions, Defendants failed to properly protect Plaintiffs' interests.

173.    By these and other acts and omissions, Defendants exposed Plaintiffs to an unreasonable risk of economic detriment and damage.

174.    Plaintiffs were unsophisticated in the ways of the United States and its law and lawyers, and justifiably relied upon Defendants more than people would who were sophisticated in the ways of the United States and its law and lawyers.

175.    Plaintiffs relied on Defendants to their detriment.

176.    Defendants knew or should have known that Plaintiffs so relied.

177.    All conditions precedent to bringing this action have been performed, have been waived, or have otherwise occurred.

178.    Plaintiffs have engaged and retained undersigned counsel to represent them in this action and are obligated to pay a reasonable fee for those services.

- 24 -

## COUNT I - NEGLIGENCE

179.     Plaintiffs hereby adopt and incorporate by reference the allegations set forth in paragraphs 1 through 174 above, as if fully set forth herein.

180.     This is a cause of action for damages for negligence.

181.     Defendants undertook the duty to perform legal services for Plaintiffs and agreed to perform those services with the reasonable care, skill, and diligence ordinarily possessed and exercised by other attorneys in the community in similar circumstances, together with the enhanced duty in the specialized area heretofore set forth.

182.     In their capacity as attorneys for Plaintiffs, Defendants owed to Plaintiffs a duty of professional care including, but not limited to, exercising that degree of care, skill, and diligence as would be exercised by other attorneys in the community under the same or similar circumstances, together with the enhanced duty in the specialized area heretofore set forth.

183.     During the period Plaintiffs employed Defendants, Defendants breached their duty to Plaintiffs by failing to exercise the care and skill required, as more particularly heretofore set forth.

184.     As a direct, proximate, and foreseeable result of Defendants' breach of their duty to adhere to the accepted

standard(s) of care, Plaintiffs suffered economic detriment and damage, including, but not limited to, failing to recover damages caused to Plaintiffs by Simpson's malpractice and failing to recover moneys due to Plaintiffs from the Laughrens for the Laughrens' fraud and conspiracy to defraud, together with the attorney's fees and costs paid to Defendants pursuant to the Agreement and to Plaintiffs' former and current attorneys hereto.

WHEREFORE, the plaintiffs, Stanley Stirzaker and Norma Stirzaker, demand judgment against the defendants, Timothy P. Howard and Howard & Associates, Attorneys at Law, P.A., jointly and severally, together with interest, costs of suit, and such other and further relief as the Court may deem just and proper.

## COUNT II - BREACH OF FIDUCIARY DUTY

185.    Plaintiffs hereby adopt and incorporate by reference the allegations set forth in paragraphs 1 through 174 above, as if fully set forth herein.

186.    This is a cause of action for damages for breach of fiduciary duty.

187.    At all times mentioned in this complaint, Defendants created and acted in a fiduciary relationship of great trust as attorneys for Plaintiffs.

188.    Defendants breached their fiduciary duties owed to Plaintiffs as set forth herein.

189.    As a direct, proximate, and foreseeable result of these breaches of fiduciary duty, Plaintiffs suffered economic

- 26 -

detriment and damage, including, but not limited to, failing to recover damages caused to Plaintiffs by Simpson's malpractice and failing to recover moneys due to Plaintiffs from the Laughrens for the Laughrens' fraud and conspiracy to defraud, together with the attorney's fees and costs paid to Defendants pursuant to the Agreement and to Plaintiffs' former and current attorneys hereto.

WHEREFORE, the plaintiffs, Stanley Stirzaker and Norma Stirzaker, demand judgment against the defendants, Timothy P. Howard and Howard & Associates, Attorneys at Law, P.A., jointly and severally, together with interest, costs of suit, and such other and further relief as the Court may deem just and proper.

### COUNT III - BREACH OF CONTRACT

190.     Plaintiffs hereby adopt and incorporate by reference the allegations set forth in paragraphs 1 through 174 above, as if fully set forth herein.

191.     This is a cause of action for damages for breach of contract.

192.     Defendants breached the Agreement as set forth herein.

193.     Plaintiffs performed all of their obligations under the terms of the Agreement.

194.     As a direct, proximate, and foreseeable result of Defendants' breaches of the Agreement, Plaintiffs suffered economic detriment and damage, including, but not limited to, failing to recover damages caused to Plaintiffs by Simpson's malpractice and

- 27 -

failing to recover moneys due to Plaintiffs from the Laughrens for the Laughrens' fraud and conspiracy to defraud, together with the attorney's fees and costs paid to Defendants pursuant to the Agreement and to Plaintiffs' former and current attorneys hereto.

WHEREFORE, the plaintiffs, Stanley Stirzaker and Norma Stirzaker, demand judgment against the defendants, Timothy P. Howard and Howard & Associates, Attorneys at Law, P.A., jointly and severally, together with interest, costs of suit, and such other and further relief as the Court may deem just and proper.

Respectfully submitted this 31st day of May, 2000.

> A. MARGARET HESFORD, P.A.
> 3500 N. State Road 7
> Suite 300
> Lauderdale Lakes, Florida 33319
> Telephone: 954-735-5341
> Facsimile: 954-736-2838
>
> By: _____
> A. Margaret Hesford
> Florida Bar no.: 907936

I, Stanley Stirzaker, have read the foregoing complaint and do swear that the allegations contained herein are true and correct to the best of my knowledge and belief.

_____
Stanley Stirzaker

STATE OF FLORIDA          )
                         )        ss.
COUNTY OF BROWARD         )


The foregoing instrument was acknowledged before me this _____ day of _____, 2000, by Stanley Stirzaker, who is personally known to me.

_____
Notary Public at Large

My commission expires:

OFFICIAL NOTARY SEAL
BRENDA B CAMPBELL
COMMISSION NUMBER
CC751620
MY COMMISSION EXPIRES
JUNE 15,2002

I, Norma Stirzaker, have read the foregoing complaint and do swear that the allegations contained herein are true and correct to the best of my knowledge and belief.

_____
Norma Stirzaker

STATE OF FLORIDA          )
                         )        ss.
COUNTY OF BROWARD         )


The foregoing instrument was acknowledged before me this _____ day of _____, 2000, by Norma Stirzaker, who is personally known to me.

_____
Notary Public at Large

My commission expires:

OFFICIAL NOTARY SEAL
BRENDA B CAMPBELL
COMMISSION NUMBER
CC751620
MY COMMISSION EXPIRES
JUNE 15,2002

## **Outline of Simpson**[1]

1.    Plaintiffs first met Simpson on August 14, 1991.

2.    In his June 7, 1994 testimony to the Florida Bar Grievance Committee,[2] Simpson claimed he first met Plaintiffs on March 12, 1992; however, he later admitted the first meeting was indeed August 14, 1991.

3.    Plaintiffs were introduced to Simpson by a mutual friend, Philip Ossi.

4.    Ossi told Plaintiffs that Simpson was the best immigration lawyer in the area.

5.    Ossi also told Plaintiffs that Simpson had assisted Ossi's extended family with their United States immigration issues.

6.    Plaintiffs consulted Simpson about the feasibility of permanent retirement in the United States.

7.    Specifically, Plaintiffs consulted Simpson about permanent immigration status in the United States.

8.    Simpson told Plaintiffs that permanent immigration status in the United States is automatic for United Kingdom citizens.

9.    Simpson guaranteed Plaintiffs that he would obtain permanent immigration status in the United States for them by no later than the end of 1992.

10.    Simpson advised Plaintiffs that, to obtain permanent immigration status, required only, in addition to completed immigration applications forms (hereafter the "INS Forms"): (1)

---

[1]    All capitalized terms herein shall have the same meaning attributed to them in Plaintiffs' complaint.

[2]    On April 19, 1993, Plaintiffs filed complaints against Simpson and Ahern with the Florida Bar. *See infra.*



EXHIBIT

'A'

birth and marriage certificates; (2) documentation of academic and professional qualifications and experience; and, (3) documentation of financial independence.

11.   Thereafter, the immigration process was automatic, but could take up to a year.

12.   Based upon being advised by Simpson that they could obtain permanent immigration status, Plaintiffs also consulted Simpson about purchasing a home in the area.

13.   Plaintiffs knew that Simpson had recently represented two of Ossi's adult children in real estate purchases.

14.   Plaintiffs told Simpson that any house purchase was expressly contingent on the following non-negotiable conditions (hereafter the "Contingencies"): (1) permanent immigration status; and (2) sale of their United Kingdom home; and (3) satisfactory results of a detailed home survey/inspection (hereafter the "Inspection") of any to-be-purchased property.

15.   Simpson thus knew that any real property purchase was dependent on the Contingencies.

16.   Simpson asked whether Plaintiffs had considered the area where they wished to live.

17.   Plaintiffs replied that they wished to live in Sawgrass Country Club, Ponte Vedra Beach.

18.   Simpson concluded the meeting by advising Plaintiffs that they should return to him when they had sold their United Kingdom home, to obtain their automatic permanent immigration status.

19.   Based on Simpson's foregoing representations, Plaintiffs

- 2 -

retained Simpson to represent them in their immigration and real estate purchase legal matters.

20.  Simpson failed to advise Plaintiffs that his areas of practice encompassed general office and trial practice.

21.  Simpson failed to advise Plaintiffs that his areas of practice did not include real estate law.

22.  Simpson failed to advise Plaintiffs that his areas of practice did not include immigration law.

23.  Following their consultation with Simpson, Plaintiffs met one Frankie Parks, a rental property manager.

24.  Ms. Parks advised that properties in Lake Kathryn, a neighborhood of Sawgrass Country Club, came on the market only rarely.

25.  Ms. Parks told Plaintiffs that one of the Lake Kathryn properties, 9008 Portsmouth Court (hereafter "9008"), had just come on the market.

26.  Ms. Parks told Plaintiffs she would take them to see 9008.

27.  Plaintiffs went to see 9008, and decided they would like to purchase it.

28.  Ms. Parks advised Plaintiffs to retain Stockton Land Corporation (hereafter "Stockton") to research this and other properties for them.

29.  To that end, Plaintiffs hired Stockton, and specifically, Pat Augspurger; Plaintiffs then returned to the United Kingdom on August 30, 1991.

- 3 -

30. Thereafter, Augspurger mailed property flyers to Plaintiffs.

31. Following their return to the United Kingdom, Plaintiffs put their United Kingdom home on the market.

32. Plaintiffs received a great deal of interest in their United Kingdom home; however, they were not prepared to sell their United Kingdom home until they had obtained permanent immigration status in the United States.

33. In January 8, 1992, Plaintiffs contacted the Forsters, the owners of 9008, in their residence in Ohio (9008 being a vacation home).

34. Plaintiffs told the Forsters they wanted to buy 9008, once the Contingencies had been satisfied.

35. Based on the foregoing, Plaintiffs asked the Forsters if they would take 9008 off the market.

36. Plaintiffs told the Forsters they would sign a contract and pay a deposit, premised upon the Contingencies.

37. The Forsters said they did not want to be committed to an open-ended contract.

38. However, the Forsters promised Plaintiffs a right of first refusal.

39. In January 1992, Augspurger mailed Plaintiffs a contract on 9008 (hereafter the "9008 Contract").

40. The 9008 Contract contained an inspection rider which gave Plaintiffs the right to have an Inspection of 9008 as they had insisted to Simpson they required.

- 4 -

41. The 9008 Contract did not include the Contingencies; however, the 9008 Contract included a section where Augspurger had indicated Plaintiffs could insert the Contingencies.

42. Nonetheless, Plaintiffs did not sign the 9008 Contract, because Simpson had told Plaintiffs they had to do everything through him.

43. In February, 1992, Plaintiffs tried to book a flight to Florida, which they could not obtain until March 1992.

44. Plaintiffs returned to Florida on March 8, 1992 for a stay of approximately two weeks.

45. Plaintiffs came to Florida to consult with Simpson; specifically, Plaintiffs came to do whatever was necessary to obtain permanent immigration status and expected to receive applicable documentation during that stay.

46. To that end, Plaintiffs brought with them: (1) their birth and marriage certificates; (2) their academic and professional qualifications and experience; and, (3) documentation of their financial independence.

47. Assuming completion and receipt of permanent immigration status, Plaintiffs also came to conclude the purchase of 9008.

48. On March 12, 1992, Plaintiffs met with Simpson for approximately one hour to discuss Plaintiffs' permanent immigration status and their property plans in the United Kingdom and the United States.

49. This was the first time Plaintiffs had had any contact with Simpson since August 1991.

- 5 -

50. Plaintiffs advised Simpson of 9008 and of their retention of Stockton.

51. Simpson told Plaintiffs this was all good, and represented that the purchase of real property, whether 9008 or another, would expedite the immigration process.

52. Simpson told Plaintiffs to ensure everyone, including Stockton, knew that he [Simpson] was handling Plaintiffs' immigration and real estate matters.

53. Simpson repeated his guarantee to Plaintiffs that he would obtain permanent immigration status in the United States for them by the end of 1992 at the latest.

54. Simpson also told Plaintiffs that ownership of Florida residential real property guarantees permanent immigration status and expedites the permanent immigration status process.

55. Simpson told Plaintiffs he would obtain their INS Forms and asked them to return to his office on March 20, 1992.

56. On March 13, 1992, Simpson first wrote to the United States Immigration and Naturalization service requesting INS Forms for Plaintiffs.

57. In the meantime, Plaintiffs were looking at other properties for sale, with 9008 as a "benchmark".

58. On or about March 13, 1992, Plaintiffs were viewing approximately eight houses per day.

59. At that time, Plaintiffs first viewed 9486 Preston Trail West (hereafter "PTW").

60. Plaintiffs spent only approximately ten minutes walking

- 6 -

through PTW with Augspurger.

61.   Neither Plaintiffs nor Augspurger inspected PTW, either in a detailed or a cursory manner.

62.   On March 18, 1992, Augspurger advised Plaintiffs that there was another buyer interested in 9008, and asked if Plaintiffs were prepared to proceed, including with a mortgage application.

63.   Plaintiffs responded that they would not proceed with any real estate purchase until they had obtained their permanent immigration status by and through Simpson.

64.   However, only because Simpson had guaranteed Plaintiffs' permanent immigration status, Plaintiffs agreed to meet with a mortgage broker.

65.   On March 19, 1992, Augspurger took Plaintiffs to view again the properties they had previously viewed, including PTW, since Plaintiffs could not recall all the properties they had seen on March 13, except for their first choice, 9008.

66.   Again, neither Plaintiffs nor Augspurger inspected PTW, either in a detailed or a cursory manner.

67.   Later on March 19, 1992, Augspurger took Plaintiffs to meet with Robert Castro, a mortgage broker, at Castro Mortgage Associates, Inc. of Jacksonville.

68.   Plaintiffs met with Castro, and advised him about the Contingencies.

69.   Plaintiffs showed Castro: (1) their birth and marriage certificates; (2) their academic and professional qualifications and experience; and, (3) documentation of their financial

- 7 -

independence they had brought to provide to Simpson in support of their permanent immigration status.

70.   Castro reviewed the documents, and particularly the documentation evidencing Plaintiffs' financial independence.

71.   Based on his review of the documentation evidencing Plaintiffs' financial independence, Castro told Plaintiffs that they qualified for a one hundred percent (100%) mortgage on 9008.

72.   Castro also told Plaintiffs that, upon the sale of their United Kingdom home, they could either pay off the 9008 mortgage or invest the proceeds of the sale of their United Kingdom home.

73.   On March 20, 1992, Plaintiffs returned to Simpson's office for the INS Forms.

74.   Simpson told Plaintiffs he had not yet received the INS Forms and that he would forward the INS Forms to Plaintiffs when he had received them.

75.   Plaintiffs told Simpson they had decided to purchase 9008.

76.   Plaintiffs also told Simpson they had been to a mortgage broker about a mortgage on 9008.

77.   Simpson told Plaintiffs this was all good, and confirmed that the purchase of property, whether 9008 or another, would expedite the immigration process.

78.   Simpson repeated that, if and when the purchase of 9008 was concluded, Plaintiffs' permanent immigration status was automatic.

79.   Simpson advised Plaintiffs to sign the 9008 contract, in

- 8 -

order to guarantee immediate permanent immigration status.

80.   Simpson asked whether Plaintiffs had viewed any other properties, for comparison purposes.

81.   Plaintiffs said they had done so, and showed Simpson the flyers of five properties.

82.   One of the five properties was PTW.

83.   Simpson reviewed the flyers, and told Plaintiffs that, while 9008 was fine, they should choose PTW, because that was the "steal" of the group.

84.   This was the first time Plaintiffs and Simpson spoke about, discussed, or in any way referenced, PTW.

85.   On March 22, 1992, Plaintiffs went to Augspurger's office.

86.   Augspurger advised Plaintiffs that 9008, their first choice of home, had been sold.

87.   Augspurger told Plaintiffs that, of the other four properties, one had been sold and two would not entertain the Contingencies.

88.   Augspurger told Plaintiffs that PTW, the fifth property, the only remaining one of the five properties, was still for sale, and the owners [the Laughrens] would agree to the Contingencies.

89.   Augspurger asked if Plaintiffs wanted her to prepare a contract on PTW.

90.   Disappointed in losing 9008 and since PTW was their least preferred choice, Plaintiffs decided to do nothing further at that time and to reconsider their options after their return to the

- 9 -

United Kingdom.

91.   Regardless, on March 22, 1992, after Plaintiffs left Augspurger's office, Augspurger prepared a contract on PTW (hereafter the "Stockton PTW Contract") to be provided to Simpson.

92.   The Stockton PTW Contract included Simpson as attorney for Plaintiffs.

93.   The Stockton PTW Contract contained: (1) an offer of $275,000; (2) a $25,000 refundable deposit; (3) an inspection rider; (4) a right to inspect; and, (5) space for addenda where Simpson was to insert the Contingencies.

94.   On March 23, 1992, Augspurger delivered the Stockton PTW Contract to Simpson.

95.   Simpson failed to present the Stockton PTW Contract to the PTW owners on Plaintiffs' behalf.

96.   On March 23, 1992, Plaintiffs telephoned Simpson from the United Kingdom, and discussed the purchase of PTW with Simpson for the first time.

97.   On March 24, 1992, Plaintiffs retained United Kingdom attorney, George Porteous, to handle the sale of their United Kingdom home.

98.   Porteous had represented Plaintiffs in prior United Kingdom property sales and purchases.

99.   Neither Porteous nor any member of his firm at any time represented Plaintiffs in any legal matter outside of England and Wales.

100.    Neither Porteous nor any member of his firm at any

- 10 -

time represented any client in any legal matter outside of England and Wales.

101.     Plaintiffs also asked Porteous if they could use his facsimile machine as a post box for communications with Simpson in Florida, since they did not own a facsimile machine; Porteous agreed.

102.     On March 24, 1992, Porteous wrote an introductory letter to Simpson, which he transmitted via facsimile.

103.     Porteous' March 24, 1992 letter set forth the respective duties towards Plaintiffs of Porteous and Simpson.

104.     Specifically, Porteous's March 24, 1992 letter detailed that Porteous represented Plaintiffs in the sale of their United Kingdom home, and included the address of said United Kingdom home.

105.     Porteous's March 24, 1992 letter also detailed that Simpson represented Plaintiffs in the purchase of their United States home, and included the address of said United States home.

106.     During the Florida Bar grievance process, Plaintiffs contacted Porteous concerning Simpson's allegations that Porteous had represented them in the PTW purchase.

107.     Porteous confirmed the respective duties of himself [Porteous] and Simpson, regarding the United Kingdom and United States real property transactions.

108.     Porteous's March 24, 1992 letter further asked whether Plaintiffs needed original documents to support the obtaining of their permanent immigration status.

- 11 -

109.      On March 25, 1992, Augspurger telephoned Simpson to discuss the Stockton contract for PTW.

110.      On April 2, 1992, Plaintiffs telephoned Simpson, asking about the status of the INS Forms.

111.      This was the first time Plaintiffs had had any contact with Simpson since March 23, 1992.

112.      Simpson replied that the INS Forms had not yet arrived.

113.      Plaintiffs asked whether they needed to provide original supporting documents to the INS Forms, such as birth certificates.

114.      Simpson told Plaintiffs he would advise them on receipt of the INS Forms.

115.      On April 6, 1992, Simpson received the INS Forms and mailed them to Plaintiffs in the United Kingdom, with a cover letter.

116.      Simpson's April 6, 1992 cover letter bore the reference: "Stirzaker purchase of Laughren property (USA)".

117.      Simpson's April 6, 1992 cover letter instructed Plaintiffs to complete the INS Forms and return them to him [Simpson].

118.      However, in his May 12, 1993 letter to the Florida Bar, which he confirmed was true in his June 7, 1994 sworn testimony to the Florida Bar, Simpson claimed that he forwarded the INS Forms to Plaintiffs, and advised them to retain an attorney who specialized in immigration law to present their application to INS.

- 12 -

119.    On April 6, 1992, Plaintiffs telephoned Simpson concerning the INS Forms.

120.    Simpson asked Plaintiffs why they were so concerned about their permanent immigration status, since he had assured Plaintiffs that their permanent immigration status was automatic and guaranteed.

121.    Simpson told Plaintiffs he had mailed the INS Forms that same day, and instructed them to complete the forms and return them to him [Simpson].

122.    On April 6, 1992, Simpson wrote to Plaintiffs via Porteous' facsimile machine post box, requesting the telephone number of PTW's owners, the Laughrens.

123.    Porteous telephoned Plaintiffs about Simpson's April 6, 1992 request about the Laughrens; Plaintiffs were totally unaware of the request or the reason for same.

124.    Plaintiffs called a friend in Sawgrass Country Club, obtained the number, and provided it to Porteous.

125.    On April 6, 1992, Porteous wrote to Simpson by facsimile, stating:

> Thank you for your recent communication.  Here
> is the Laughrens' phone number, 904-285-5053.

126.    On April 9, 1992, Simpson forwarded by facsimile to Porteous' office a letter to Plaintiffs with five numbered paragraphs containing the Laughrens' terms for the purchase of PTW.

127.    On April 10, 1992, Porteous received the April 9, 1992 letter (due to the U.K./U.S. time difference) and telephoned

- 13 -

Plaintiffs to come and collect it.

128.     Plaintiffs reviewed Simpson's April 9, 1992 letter, and were shocked to receive same, where Simpson was asking whether to proceed with a contract for the purchase of real estate when Plaintiffs had not received the INS Forms, much less their permanent immigration status.

129.     On April 10, 1992, Plaintiffs telephoned Simpson at Simpson's home; Simpson's son said Simpson was unavailable and to telephone Simpson at his office the following day.

130.     On April 10, 1992, Plaintiffs mailed a hand-written letter to Simpson containing thirteen questions regarding his April 9, 1992 letter.

131.     Plaintiffs' April 10, 1992 letter confirmed that they would not consider purchasing PTW (or any other property) until they had obtained their permanent immigration status and an Inspection of PTW (or any other property) had been satisfactorily undertaken.

132.     Plaintiffs specified what they expected the Inspection to encompass, including, in addition to the normal structural examination: (1) plumbing; (2) electrical systems; (3) drainage; (4) air conditioning; (5) heating; and, (6) appliances.

133.     On April 11, 1992, Plaintiffs telephoned Simpson, and spoke with him for more than ten minutes.

134.     The April 11, 1992 conversation encompassed everything in Plaintiffs' April 10, 1992 letter, including their permanent immigration status.

- 14 -

135.     Plaintiffs repeated that they wanted the Inspection, which was to include the additional items referenced in their April 10, 1992 letter.

136.     Simpson agreed with all of Plaintiffs' requests regarding the Inspection.

137.     Simpson repeated his permanent immigration status guarantee.

138.     On April 14, 1992, Plaintiffs went to Porteous' office to have their April 10, 1992 letter forwarded to Simpson by facsimile.

139.     Prior to its April 14, 1992 transmission, Plaintiffs' April 10, 1992 letter was reduced to typewritten form, the thirteen questions were condensed to ten questions, and those ten questions were then transmitted by facsimile to Simpson.

140.     On the same date, Simpson replied, via facsimile, to Plaintiffs' typewritten letter from Porteous' office.

141.     Simpson's reply was not responsive to all thirteen questions, but stated that all the questions would be answered in the new contract which he was drawing up with Ahern, the Laughrens' attorney.

142.     On the morning of April 15, 1992, Ahern and the Laughrens went to Simpson's office, at Simpson's invitation, to negotiate the terms and changes to the Stockton PTW Contract.

143.     The outcome of the April 15, 1992 negotiations was a contract for the purchase and sale of PTW prepared by Ahern (hereafter the "Ahern PTW Contract").

- 15 -

144.      The Ahern PTW Contract did not contain the
Contingencies.

145.      In fact, Simpson agreed to an "As Is" clause with no
right of inspection, as opposed to the Inspection demanded by
Plaintiffs, which included, in addition to the normal structural
examination: (1) plumbing; (2) electrical systems; (3) drainage;
(4) air conditioning; (5) heating; and, (6) appliances.

146.      The Ahern PTW Contract stated that there were no
latent defects the sellers knew of.

147.      Simpson also incorporated into the Ahern PTW
Contract an Arvida Realty Sales (hereafter "Arvida") brochure,
which stated PTW was:

> One owner, lovingly cared for and in excellent
> condition.

148.      Simpson further agreed to a provision that "Buyers
acknowledge that they have inspected the property and accepted it
in its present As Is condition."

149.      Plaintiffs were in the United Kingdom and thus
unable to inspect PTW.

150.      Simpson knew that Plaintiffs were in the United
Kingdom and thus unable to inspect PTW.

151.      At 4:12 p.m. United States East Coast time on April
15, 1992, Plaintiffs telephoned Simpson.

152.      This was a routine status conference/conversation.

153.      Simpson did not advise Plaintiffs of the morning's
negotiations.

- 16 -

154.     In fact, Plaintiffs did not learn of the April 15, 1992 negotiations until the June 7, 1994 Florida Bar grievance committee hearing, which resulted from Plaintiffs' complaint against Simpson to the Florida Bar.

155.     On April 16, 1992, Ahern transmitted to Simpson by facsimile the Ahern PTW Contract as "negotiated" on April 15, 1992, together with a facsimile cover letter.

156.     Ahern's cover letter to his facsimile transmission asked Simpson to review the Ahern PTW Contract and provide his comments.

157.     On April 21, 1992, Plaintiffs telephoned Simpson to ask about their April 10 letter and its thirteen questions.

158.     Simpson told Plaintiffs that the Inspection on PTW, which they had demanded, had been completed, and that PTW was defect free and in excellent condition.

159.     Plaintiffs requested a copy of the Inspection.

160.     Simpson told Plaintiffs that the Inspection was in his files, but he was not permitted to send a copy out of the United States.

161.     However, no Inspection had been, nor was ever, undertaken.

162.     Simpson also asked whether Plaintiffs had received the INS Forms from Simpson; they said they had not.

163.     Later that day, April 21, 1992, Plaintiffs received the INS Forms from Simpson.

164.     On April 22, 1992, Simpson forwarded by facsimile to

- 17 -

Porteous the Ahern PTW Contract and Ahern's cover letter.

165.    The inclusion of Ahern's cover letter assured Plaintiffs that Simpson had reviewed the Ahern PTW Contract.

166.    The Ahern PTW Contract, transmitted via facsimile from Ahern to Simpson and via facsimile from Simpson to Porteous, was illegible.

167.    On April 22, 1992, Porteous mailed the facsimile Ahern PTW Contract to Plaintiffs, with a cover letter.

168.    On April 23, 1992, Plaintiffs went to Porteous' office.

169.    Plaintiffs did not recognize the Ahern PTW Contract as a legal document.

170.    Plaintiffs therefore telephoned Simpson at his office from Porteous' office.

171.    Plaintiffs spoke to Simpson via speakerphone.

172.    Plaintiffs told Simpson they could not read the Ahern PTW Contract.

173.    Simpson told Plaintiffs:

> to sign it anyway and return it to me a.s.a.p. because I need to use it as proof to the INS that you are serious about purchasing full time residential property in the United States.

174.    Simpson also told Plaintiffs to have Porteous witness their signatures on the Ahern PTW Contract.

175.    On this the only occasion that Porteous spoke to Simpson, Porteous said he was not comfortable witnessing Plaintiffs' signatures to a document which he could not read.

176.     Simpson screamed at Porteous that:

I'm their attorney in this U.S. of A., which
is a democracy.  Just get them to sign the God
damned thing and send it back to me a.s.a.p.

177.     Simpson then hung up the phone.

178.     Since Porteous represented Plaintiffs only in the sale of their United Kingdom home, and since he [Porteous] had clearly delineated the respective duties of himself and Simpson in his March 24, 1992 letter to Simpson, Porteous complied with Simpson's demand.

179.     In other words, Porteous was not acting as Plaintiffs' attorney in any capacity in relation to any legal matter in the United States.

180.     On April 27, 1992, Plaintiffs wrote to Simpson by facsimile that they had approved the Ahern PTW Contract in principle, insofar as it supported their permanent immigration status.

181.     Again, Porteous undertook to follow Simpson's instructions as to witnessing Plaintiffs' signatures because he, Porteous, had clearly delineated the respective duties of himself and Simpson in his March 24, 1992 letter to Simpson.

182.     Again, Porteous was not acting as Plaintiffs' attorney in any capacity in relation to any legal matter in the United States.

183.     Plaintiffs' letter said a deposit on PTW (hereafter the "Deposit") was also being forwarded, and that Simpson should retain the Deposit until a final PTW contract was drawn up.

- 19 -

184.     In fact, the **Ahern** PTW Contract was the final PTW contract.

185.     Neither Plaintiffs nor Porteous knew there had been any negotiations concerning the PTW purchase.

186.     On April 28, 1992, Simpson wrote to Plaintiffs that they must sign the Ahern PTW Contract, and Federal Express it to him [Simpson] with the $75,000 Deposit.

187.     On April 30, 1992, Plaintiffs telephoned Simpson.

188.     This was a status conference/conversation, which included Plaintiffs' permanent immigration status, the PTW purchase, Simpson making an offer pursuant to the Stockton PTW Contract, and the inventory of PTW personal property.

189.     Simpson repeated the results of the Inspection.

190.     As far as Simpson making an offer on PTW pursuant to Plaintiffs' April 10, 1992 letter to Simpson, Simpson said he would do it, but this was not the right time.

191.     Plaintiffs were not concerned about the $75,000 Deposit being non-refundable because: (1) Simpson had guaranteed them permanent immigration status; (2) Simpson had assured them the Inspection had been carried out and that PTW was defect free and in excellent condition; and (3) they were planning to pay cash for PTW, so if Plaintiffs' $250,000 offer (per their April 10, 1992 letter) was accepted, the Deposit would merely reduce the cash to close.

192.     On May 6, 1992, Plaintiffs Federal Expressed the following to Simpson: (1) a two page hand-written letter, informing

- 20 -

him completion of the PTW purchase was subject to a satisfactory detailed home survey, as previously detailed to Simpson; (2) a check for $35,000 as part of the Deposit, made out to K.A. Simpson, Trust Account; (3) a signed copy of the Ahern PTW Contract; (4) the completed INS Forms; and, (5) Plaintiffs' hand-written notes on Simpson's April 6 cover letter.

193.    Plaintiffs later learned Simpson had turned over the $35,000, the first portion of the Deposit, to Ahern.

194.    On May 7, 1992, Plaintiffs telephoned Simpson to ask again for a copy of the Inspection.

195.    Simpson repeated that he had already told Plaintiffs he could not send a copy outside the United States.

196.    Simpson also repeated to Plaintiffs what he had previously told them, that PTW was defect free and in excellent condition.

197.    On May 12, 1992, Simpson noted on Plaintiffs' May 6, 1992 letter his May 12, 1992 receipt of the Ahern PTW Contract signed by Plaintiffs.

198.    Simpson dated the Ahern PTW Contract on May 12, 1992.

199.    On May 13, 1992, Simpson contacted INS and learned that, contrary to his repeated guarantees to Plaintiffs, they could not obtain automatic entry into and permanent residency in the United States.

200.    Later on May 13, 1992, Simpson telephoned United States immigration attorney David Vedder.

- 21 -

201.      Thereafter on May 13, 1992, Simpson wrote to David Vedder, that he had discussed, with Plaintiffs that morning, his [Vedder's] representation of Plaintiffs regarding their permanent immigration status.

202.      Simpson never telephoned Plaintiffs in the United Kingdom, either on May 13, 1992 or at any other time.

203.      On May 15, 1992, Ahern amended the Ahern PTW Contract to allow the Laughrens at least thirty (30) days prior notice of closing, and transmitted same via facsimile to Simpson with a cover letter.

204.      Despite having learned Plaintiffs could not obtain automatic entry into and permanent residency in the United States, and despite knowing that no Inspection had been undertaken, Simpson did not seek to amend the Ahern PTW Contract to include the Contingencies.

205.      Despite having learned Plaintiffs could not obtain automatic entry into and permanent residency in the United States, and despite knowing that no Inspection had been undertaken, Simpson proceeded with the Ahern PTW Contract.

206.      Plaintiffs did not ask Simpson to amend the Ahern PTW Contract to include the Contingencies because: (1) Simpson had repeatedly told Plaintiffs their permanent immigration status was automatic; (2) Simpson had told them the Inspection on PTW, which they had demanded, had been completed, and that PTW was defect free and in excellent condition; (3) the Ahern PTW Contract expressly stated there were no latent defects the sellers knew of; (4) the

- 22 -

Ahern PTW Contract stated PTW was in excellent condition; and, (5) the sale of Plaintiffs' United Kingdom home was underway.

207.     On May 19, 1992, Simpson mailed the amended Ahern PTW Contract to Plaintiffs at their United Kingdom home address, with a cover letter.

208.     By forwarding the amended Ahern PTW Contract to Plaintiffs, Simpson demonstrated his representation of Plaintiffs in the purchase of PTW.

209.     Porteous never saw the amended Ahern PTW Contract.

210.     On May 26, 1992, Plaintiffs received an unsolicited May 13, 1992 letter from attorney David Vedder.

211.     This May 13, 1992 letter, received by Plaintiffs on May 26, 1992, was the first time Plaintiffs had ever heard of, or from, either attorney Vedder or any other immigration attorney other than Simpson.

212.     Vedder's letter said Simpson had spoken to him [Vedder] that morning regarding his [Vedder's] representation of Plaintiffs for their permanent immigration status.

213.     Simpson had never spoken to Plaintiffs about his contact or conversation(s) with Vedder.

214.     Moreover, Plaintiffs had never authorized Simpson to approach any other attorney to represent them in any matter, including immigration.

215.     On May 27, 1992, Plaintiffs initialled the amendment and returned it to Simpson, with their cover letter, together with the forty thousand dollars ($40,000) bank draft balance of the

- 23 -

seventy-five thousand dollar ($75,000) Deposit.

216.     Plaintiffs' May 27, 1992 cover letter communicated their initial alarm over Vedder's involvement.

217.     However, and as set forth in their May 27, 1992 letter, Plaintiffs believed Simpson's guarantee of permanent immigration status by no later than the end of 1992, and therefore trusted Simpson had arranged with Vedder to timely complete the process.

218.     As the day progressed, Plaintiffs became more and more troubled about their permanent immigration status.

219.     At 11:19 p.m., United Kingdom time, on May 27, 1992, Plaintiffs telephoned the Laughrens.

220.     Plaintiffs told the Laughrens they were going to take their United Kingdom home off the market and cancel their plans to live in Florida.

221.     The Laughrens told Plaintiffs they would speak to Ahern about finding a local (Jacksonville) immigration law attorney, who could obtain permanent immigration status for Plaintiffs by no later than the end of 1992.

222.     On May 28, 1992, the Laughrens telephoned Plaintiffs in the United Kingdom, and told Plaintiffs Ahern had arranged for them to consult Jacksonville immigration attorney David Fletcher during Plaintiffs' upcoming August 1992 Sawgrass Country Club vacation.

223.     On May 28, 1992, the Laughrens telephoned Simpson, Plaintiffs' attorney, and asked him to forward all of Plaintiffs'

- 24 -

visa documents to Fletcher.

224.     On May 29, 1992, Plaintiffs telephoned Fletcher at 8:30 a.m. United States East Coast time, to discuss Simpson's previous work on their permanent immigration status.

225.     Plaintiffs told Fletcher that Simpson had already submitted their INS Forms to the United States Immigration and Naturalization Service (hereafter the "INS").

226.     However, Simpson needed help in getting the INS Forms finalized by the December 1992 date he had promised Plaintiffs.

227.     Plaintiffs believed that Simpson had submitted their INS Forms to the INS on or about May 12, 1992.

228.     On May 29, 1992, Plaintiffs telephoned Simpson at 3:06 p.m., United States East Coast time to tell him that they were going to use Fletcher instead of Vedder, because Fletcher was in Jacksonville where Vedder was in Daytona Beach.

229.     Simpson told Plaintiffs that he would work in tandem with Fletcher to obtain Plaintiffs' permanent immigration status before the end of 1992.

230.     On June 2, 1992, Simpson wrote to Fletcher, advising him that his [Simpson's] office represented the Stirzakers, and requesting information on **starting** their permanent immigration status process.

231.     On June 15, 1992, Simpson's billing records reflect that he reviewed Plaintiffs' May 27, 1992 letter which quoted his guarantee of "visa status by the end of 1992 at the latest."

- 25 -

232.     On June 15, 1992, Simpson telephoned Vedder and Ahern for a total of ninety minutes; Plaintiffs surmise that Simpson asked Vedder if he [Vedder] could find some way of obtaining permanent immigration status for Plaintiffs as soon as possible.

233.     On June 18, 1992, Fletcher wrote to Simpson about Simpson's prior representation of Plaintiffs.

234.     Fletcher advised Simpson that he had spoken both to the Laughrens and Mr. Stirzaker, who had all told him [Fletcher] that Simpson had previously been working on Plaintiffs' permanent immigration status.

235.     On June 19, 1992, Ahern sent to Simpson the commitment for title insurance for PTW, with a cover letter asking Simpson to review same.

236.     Ahern drew up the commitment in his capacity as Jacksonville agent for Commonwealth Land Title Insurance Company.

237.     Subsequent to closing, Ahern, again in his capacity as Jacksonville agent for Commonwealth Land Title Insurance Company, drew up the title insurance policy.

238.     On June 22, 1992, Simpson airmailed the commitment for PTW to Plaintiffs' United Kingdom home address with a cover letter.

239.     By forwarding the commitment for PTW to Plaintiffs, Simpson demonstrated his representation of Plaintiffs in the purchase of PTW.

240.     Porteous never saw the Commitment.

- 26 -

241.     The Ahern PTW Contract required Simpson, for the Buyer [Plaintiffs] to arrange a land survey of PTW.

242.     Not only was no Inspection undertaken, but Simpson did not even arrange for a land survey of PTW.

243.     Instead, Simpson asked Ahern to arrange for the land survey.

244.     Ahern selected his next-door neighbor H.A. Durden to perform the land survey.

245.     On June 24, 1992, Durden performed the land survey of PTW (hereafter the "Durden Land Survey").

246.     The Durden Land Survey did not include: (1) the original 1980 plan outline of PTW; (2) a later extensive screen porch at the rear of PTW; and, (3) a one thousand two hundred ten (1,210) square foot addition to PTW constructed, contrary to building code standards, by Mr. Laughren in 1985.

247.     The Durden Land Survey made it appear PTW was entirely constructed in 1985, as opposed to in various stages prior to 1985.

248.     On June 26, 1992, Ahern hand-delivered the Durden Land Survey to Simpson with a cover letter asking Simpson to review the Durden Land Survey.

249.     On June 29, 1992, Simpson airmailed the Durden Land Survey to Plaintiffs' United Kingdom home address with a cover letter.

250.     By forwarding the Durden Land Survey to Plaintiffs, Simpson demonstrated his representation of Plaintiffs in the

- 27 -

purchase of PTW.

251.       Porteous never saw the Durden Land Survey.

252.       Plaintiffs understood the Durden Land Survey to be just that, a land survey.

253.       Plaintiffs never considered the Durden Land Survey to be the Inspection they had always demanded of Simpson, including, but not limited to, their April 10, 1992 and April 14, 1992 letters.

254.       On July 20, 1992, Plaintiffs Federal Expressed the following to Fletcher: (1) a completed visa questionnaire; (2) copies of all supporting documents required by the questionnaire; and, (3) a cover letter.

255.       On July 20, 1992 and July 31, 1992, Plaintiffs telephoned Fletcher to discuss the documents Federal Expressed to him and to ask whether they needed to bring any other documents to Florida regarding their permanent immigration status.

256.       On August 2, 1992, Plaintiffs flew from the United Kingdom to Florida.

257.       On or about August 6, 1992, Plaintiffs had a two hour office conference with Fletcher.

258.       Fletcher told Plaintiffs that: (1) permanent immigration status in the United States was formerly automatic for United Kingdom citizens, but had been discontinued some fifteen years earlier; (2) Simpson dated the Ahern PTW Contract on May 12; and, (3) the signed Ahern PTW Contract did not contain the Contingencies, including, of course, permanent immigration status

- 28 -

for Plaintiffs.

259.     At this time, neither Plaintiffs nor Fletcher were aware that Simpson had failed to submit the INS Forms to the INS.

260.     Immediately after leaving Fletcher's office, Mrs. Stirzaker telephoned Simpson to advise him of the terrible news they received from Fletcher about their permanent immigration status.

261.     Simpson screamed abuse at Mrs. Stirzaker, who terminated the call.

262.     On August 7, 1992, Plaintiffs took to Simpson's office, in the form of a letter, their handwritten contemporaneous notes of their meeting with Fletcher.

263.     Simpson's office told Plaintiffs that Simpson was not available to see them because he had left for his annual vacation in North Carolina, and would not return until mid-September.

264.     During this visit to Florida, Plaintiffs passed PTW each day, since it was on their route out of Sawgrass Country Club.

265.     Plaintiffs attempted to visit PTW on numerous occasions, but only gained entry three times.

266.     On each occasion, Mrs. Laughren took Plaintiffs round the back of PTW, into the screened porch.

267.     On one of those occasions, Plaintiffs negotiated with the Laughrens to buy, for five thousand dollars ($5,000), the personal property referenced in Plaintiffs' April 10, 1992 and April 14, 1992 letters to Simpson.

- 29 -

268.        Plaintiffs did not, and would not have attempted to, inspect PTW at any time, since they had instructed Simpson to obtain the Inspection and he [Simpson] had told them the Inspection had already been completed.

269.        Moreover, Mrs. Laughren did not permit Plaintiffs to enter the house unless supervised by her or to have any free access thereto, on the basis that Mr. Laughren was dying, following unsuccessful heart bypass surgery.

270.        In fact, as Mr. Laughren's medical records disclose, Mr. Laughren never had any heart surgery, at that time or ever.

271.        During all five visits, Plaintiffs saw no more than the personal property referenced in Plaintiffs' April 10, 1992 and April 14, 1992 letters to Simpson.

272.        On August 14, 1992, the Laughrens locked up PTW and, like Simpson, went to North Carolina on vacation.

273.        On August 28, 1992, the Laughrens returned to Sawgrass Country Club.

274.        In September 1992, Mrs. Nancy Laughren telephoned Plaintiffs in the United Kingdom; Mrs. Laughren sounded hysterical.

275.        Mrs. Laughren asked Plaintiffs if they would release eighteen thousand dollars ($18,000) from the $75,000 Deposit "to pay for emergency life-saving heart surgery for Mr. Laughren"; Plaintiffs agreed.

276.        Plaintiffs believed Simpson was holding the entire Deposit in his escrow account.

277.        Plaintiffs told Mrs. Laughren to contact Simpson so

- 30 -

he could arrange for the release to Mrs. Laughren of $18,000 of the $75,000 Deposit that was being held until the closing on PTW (hereafter the "PTW Closing").

278.     Moreover, Plaintiffs later learned that Mrs. Laughren's request had nothing to do with emergency life-saving surgery.

279.     Plaintiffs in fact learned that the Laughrens were in default on their eighty-four thousand dollar ($84,000) mortgage on PTW (hereafter the "Laughren PTW Mortgage") with First Union Bank.

280.     FUNB had foreclosed on the Laughren PTW Mortgage in February 1992.

281.     Ahern had negotiated a six month extension of time for the Laughrens to bring the Laughren PTW Mortgage current.

282.     In September 1992, the Laughrens needed $18,000 to bring the Laughren PTW Mortgage current.

283.     In September 1992, the Laughrens did not have $18,000 to bring the Laughren PTW Mortgage current.

284.     On September 16, 1992, Simpson provided Ahern the details of Porteous' office facsimile "post box".

285.     This was in order that Ahern could transmit to Porteous' office the documents for the release of the $18,000 to the Laughrens prior to the PTW Closing.

286.     Simpson provided this information to Ahern even though Simpson represented Plaintiffs and Ahern represented the opposing parties, the Laughrens, in the PTW purchase.

- 31 -

287.    Thereafter, **Ahern** altered Plaintiffs' verbal agreement, to release the $18,000 for the emergency life-saving surgery, to a written agreement, to pay $18,000 for personal property of the Laughrens.

288.    September 16, 1992 was "Black Wednesday" in the United Kingdom, when the Pound Sterling dropped dramatically in value against the United States dollar.

289.    As a result of "Black Wednesday" and its effect on their United Kingdom finances, Plaintiffs needed an additional seventy-five thousand dollars ($75,000) to complete the two hundred ninety-nine thousand dollar ($299,000) purchase of PTW.

290.    Plaintiffs then decided to seriously consider taking out a mortgage to complete the purchase of PTW.

291.    On September 21, 1992, Plaintiffs forwarded to Ahern by facsimile the release **addendum** for the $18,000 signed by Plaintiffs.

292.    At that time, the only PTW personal property Plaintiffs had seen were those items referenced in their April 10, 1992 and April 14, 1992 letters to Simpson, specifically: (1) large television in gallery; (2) all other televisions, stereos, and radios; (3) all minor domestic electrical items, such as kettles, coffee makers, toasters, vacuum cleaners, and hostess trolley; (4) all garden equipment; (5) **ride** on mower; and, (6) electrical gardening implements and **general** gardening tools.

293.    On November 10, 1992, Plaintiffs were approved for a one hundred ten thousand dollar ($110,000) mortgage by Robert

- 32 -

Castro of Castro Mortgage Associates, Inc. as part of the purchase price of PTW.

294.     This was the same Robert Castro whom Plaintiffs had met on March 19, 1992, and who had qualified Plaintiffs for a mortgage on 9008.

295.     On November 10, 1992, Castro forwarded to Plaintiffs by facsimile for Plaintiffs' signatures, mortgage documents bearing an interest rate of eight and one half percent (8.5%).

296.     On December 2, 1992, Plaintiffs telephoned Simpson at 2:00 p.m. United States East Coast time.

297.     Plaintiffs told Simpson they had arranged for a mortgage to complete their purchase of PTW (hereafter the "Castro PTW Mortgage").

298.     Plaintiffs told Simpson to expect contact from Castro.

299.     Simpson immediately notified Ahern about the Castro PTW Mortgage.

300.     The Laughrens knew that PTW contained many serious material defects.

301.     Ahern, the Laughrens' long time close family friend, knew that PTW contained many serious material defects, not least because Ahern's wife assisted Mrs. Laughren is concealing the defects, including, but not limited to: (1) affixing a mirror on the entire width and height of the fireplace chimneybreast to cover water damage to the wall; (2) painting over water damage stains on interior walls, ceilings, and window frames; (3) affixing carpeting

- 33 -

over a crack in the foundation of the concrete floor of the entire house; (4) affixing duct tape over the rot and bug damage to window frames, base boards, door frames, and exterior wood siding; (5) painting over the duct tape to match the applicable decor so that the duct tape would not be noticeable; (6) repeatedly painting the walls and ceilings due to water damage as a result of rain; (7) covering leaks in the roof with plastic and nailing back the shingles; (8) placing and replacing blankets under the shingles to soak up the water from the roof leaks; (9) affixing the window blinds to the frames so the damage to the window frames, glass, and seals could not be seen; (10) arranging the furniture so that water seeping up through the foundations could not be detected; (11) applying concrete around the fireplace chimneybreast and the hearth to prevent water seeping out.

302.     Bill Mathey, a neighbor of the Laughrens whose driveway adjoins the Laughrens' driveway, observed Ahern's wife assisting Mrs. Laughren in concealing the defects.

303.     Ahern, a real estate attorney, knew that Castro would require standard documentation in support of the Castro PTW Mortgage, such as (hereafter the "Mortgage Documentation"): (1) a professional appraisal of PTW to estimate its current market value; (2) a professional home inspection report of PTW to determine its physical condition; (3) a roof inspection report which would show whether PTW's roof had a minimum life expectancy of two years; (4) a wood destroying organism report which would show whether there was any wood destroying organism damage in PTW; (5) a land survey

- 34 -

which would show the initial construction of PTW and later additions to the property; and, (6) a title inspection by a title insurance company of Castro's choice.

304.    None of the Castro Mortgage Documentation items were included in the Ahern PTW Contract.

305.    The Laughrens knew that, if the Castro Mortgage Documentation items were obtained by any independent third party, Plaintiffs would, as a result, not complete the purchase of PTW.

306.    Ahern knew that, if the Castro Mortgage Documentation items were obtained by any independent third party, Plaintiffs would, as a result, not complete the purchase of PTW.

307.    On December 3, 1992, Plaintiffs received an unexpected telephone call from Mr. Laughren.

308.    Mr. Laughren told Plaintiffs that Simpson had told Ahern about the Castro PTW Mortgage.

309.    Mr. Laughren offered Plaintiffs an interest-free seventy-five thousand dollar ($75,000) purchase money mortgage (hereafter the "Laughren Purchase Money Mortgage").

310.    Mr. Laughren's offer was designed to prevent the obtaining of the Castro Mortgage Documentation items and Plaintiffs' concomitant cancellation of the Ahern PTW Contract.

311.    In December 1992, Ahern prepared documentation of the Laughren Purchase Money Mortgage.

312.    Ahern forwarded the Laughren Purchase Money Mortgage documentation to Simpson for his review and approval.

313.    The PTW Closing had been scheduled for December 18,

- 35 -

1992.

314.     On December 18, 1992, Plaintiffs migrated from the United Kingdom to the United States.

315.     Plaintiffs expected to take possession of PTW on their arrival.

316.     Plaintiffs' flight was delayed, and they did not reach PTW until 10:30 p.m.

317.     Plaintiffs were shocked to find that the Laughrens were still in possession of PTW.

318.     The Laughrens told Plaintiffs that the PTW Closing had been postponed until January 4, 1993.

319.     On December 19, 1992, Plaintiffs met with Simpson, who confirmed the postponement of the PTW Closing until January 4, 1993.

320.     The PTW Closing was not postponed for Plaintiffs, but for the Laughrens, since the owner of the house the Laughrens were purchasing, located at 2 Cove Road, Sawgrass Country Club (hereafter the "Cove Road House"), would not close that purchase until after the end of the year.

321.     As a result of the unexpected postponement, Plaintiffs had to rent a condominium from December 19, 1992 through January 7, 1993.

322.     During the time between their arrival on December 18, 1992 and the PTW Closing (hereafter the "Pre-PTW Closing Time"), Plaintiffs heard unsavory rumors about PTW and the Laughrens (hereafter the "Rumors").

- 36 -

323.     As a result of the Rumors, Plaintiffs repeatedly went to PTW in an attempt to gain entrance, but were unsuccessful.

324.     During the Pre-PTW Closing Time, Plaintiffs repeatedly asked Simpson to cancel or postpone the PTW Closing until they had investigated the Rumors.

325.     Despite having postponed the PTW Closing for the Laughrens, Simpson refused to postpone or cancel the PTW Closing for Plaintiffs to investigate the Rumors.

326.     Between December 19, 1992 and January 4, 1993, Simpson repeatedly threatened Plaintiffs that they would be subject to damages of one million five hundred thousand dollars ($1,500,000) if they cancelled the PTW Closing.

327.     Simpson computed the $1,500,000 in damages as follows: (1) loss of the $75,000 Deposit; (2) $224,000, the balance of the purchase price, in a specific performance action; (3) attorney's fees and costs; and, (4) punitive damages.

328.     The Ahern PTW Contract did not contain a clause providing that the buyers, Plaintiffs, could be forced to specifically perform the Ahern PTW Contract.

329.     However, the Second Addendum, as one of its only three modification provisions to the Ahern PTW Contract, does provide, as is customary in the purchase of real estate, that Plaintiffs, as buyers, could enforce specific performance against the Laughrens, as sellers.

330.     Moreover, the Second Addendum expressly includes in pertinent part, that:

- 37 -

> If Buyer [Plaintiffs] fails to perform this
> contract within the time specified (including
> payments of all deposits hereunder), the
> deposit(s) paid or to be paid hereunder by
> Buyer shall be retained by the Seller [the
> Laughrens] as agreed liquidated damages,
> consideration for the execution of this
> contract, and in full settlement of any claim;
> whereupon Buyer and Seller shall be relieved
> of all obligations under this contract.

(emphasis added).

331.    Therefore, Simpson clearly fell below the accepted standard of care, by advising Plaintiffs that they could be liable for specific performance and/or attorney's fees and costs when the Ahern PTW Contract precluded same on its face by limiting the Laughrens to, at most, the amount of the Deposit.

332.    Moreover, Simpson also clearly fell below the accepted standard of care, by advising Plaintiffs that they could be liable for specific performance and/or attorney's fees and costs where applicable law provides for the remedy of specific performance to buyers, on the basis of the real estate's unique character, and not to sellers (unless expressly provided for, which is not the case here), who are only due money, not of the unique character normally required for specific performance.

333.    In addition to threatening Plaintiffs with the $1,500,000 in damages, Simpson advised Plaintiffs that PTW was a steal at $299,000, and that it would be worth $450,000 in eighteen months time.

334.    On the morning of January 4, 1993, the scheduled PTW Closing, Simpson telephoned Plaintiffs at their rented condominium.

- 38 -

335.     Simpson instructed Plaintiffs to obtain a cashier's check, made payable to Buschman, Ahern & Persons, for one hundred forty-nine thousand, seven hundred ninety-eight dollars and 29/100 ($149,798.29), to complete the purchase price of PTW.

336.     Simpson instructed Plaintiffs to take the cashier's check to his, Simpson's, office at 3:30 p.m. that day.

337.     When Plaintiffs arrived at Simpson's office at 3:30 p.m., they told him they did not want to close on PTW.

338.     Simpson told Plaintiffs this was "a done deal" and that they would incur the $1,500,000 damages if they refused to close.

339.     Simpson then instructed Plaintiffs to sign the following documents in his presence in his office prior to the PTW Closing: (1) a closing statement including an amount of $149,798.29; and, (2) the $75,000 Laughren Purchase Money Mortgage.

340.     Simpson did not explain the closing statement or the Laughren Purchase Money Mortgage to Plaintiffs.

341.     Simpson also told Plaintiffs to give the $149,798.29 cashier's check to him for safe-keeping.

342.     Mr. Stirzaker said he was going to keep the check.

343.     Simpson told Mr. Stirzaker:

> I'm not going to let you walk around with that
> check.  It's as good as cash.  It's going in
> my safe now.

344.     Plaintiffs gave Simpson the $149,798.29 cashier's check for safe-keeping.

345.     Simpson told Plaintiffs the PTW Closing would not

- 39 -

take place that day, January 4, 1993, because Ahern had forgotten to get a wood destroying organism inspection (hereafter "WDO Inspection") for PTW.

346.     The Ahern PTW Contract in fact required Simpson, not Ahern, to have a WDO Inspection performed on PTW before closing.

347.     Plaintiffs asked Simpson if they could cancel the Ahern PTW Contract if the WDO Inspection showed damage to PTW.

348.     Simpson told Plaintiffs that WDO damage was not grounds for them to cancel the Ahern PTW Contract.

349.     Simpson then told Plaintiffs he was going to Ahern's office.

350.     Simpson told Plaintiffs the only reason he was going to Ahern's office was:

> to watch Nancy Laughren's face when he waved Plaintiffs' $149,000 check in her face and told her that she could not have the money to close on her new condominium until after the PTW WDO inspection had been performed and reviewed and approved by him [Simpson].

351.     At 4:00 p.m. on January 4, 1993, no WDO Inspection had been performed on PTW.

352.     Simpson and Plaintiffs were to travel to Ahern's office together.

353.     Plaintiffs continued to insist that they wanted to cancel the Ahern PTW Contract.

354.     Simpson again threatened Plaintiffs with the $1,500,000 damages.

355.     Simpson then told Plaintiffs to drive to Ahern's

- 40 -

office by themselves and without him.

356.     Present in Ahern's office were: (1) Ahern; (2) the Laughrens; (3) the Arvida sales agent, E. Joyce Reesh; (4) Augspurger, the Stockton sales agent; (5) Simpson; and, (6) Plaintiffs.

357.     Within a few minutes of entering Ahern's office at 4:00 p.m., Simpson told Plaintiffs that a WDO Inspection of a four thousand one hundred (4,100) square foot wooden house would take in excess of six (6) hours.

358.     Simpson then immediately adjourned the PTW Closing until the WDO Inspection could be performed and the resulting report reviewed and approved by him [Simpson].

359.     Simpson told everyone present that he would contact each of them when a new PTW Closing could be set.

360.     However, in his May 12, letter to the Florida Bar, Simpson stated that a WDO report, both clearance letters, and the related repairs, were completed on January 4, 1993.

361.     Simpson never scheduled a new PTW Closing, because the PTW Closing indeed took place on January 4, 1993.

362.     On January 4, 1993, PTW was still owned by the Laughrens.

363.     On January 4, 1993, without Plaintiffs' knowledge or permission, Simpson handed over Plaintiffs' $149,798.29 cashier's check to Ahern.

364.     Therefore, on January 4, 1993, Plaintiffs' entire $224,798.29 was in the possession and control of the Laughrens'

- 41 -

attorney, Ahern.

365.    Thereafter on January 4, 1993, and despite the fact the PTW Closing had not taken place, Ahern disbursed Plaintiffs' $224,798.29 to the Laughrens; his contemporaneously dated checks confirm same.

366.    The Laughrens knew that the $224,798.29 was Plaintiffs' money, to which they, the Laughrens, were not entitled unless and until the PTW Closing took place.

367.    At 5:00 p.m. on January 4, 1993, the Laughrens used Plaintiffs' money at the previously scheduled Cove Road House closing, towards the purchase of the Cove Road House.

368.    The balance of the purchase price of the Cove Road House was funded with a mortgage, signed on January 4, 1993, and previously arranged by Ahern.

369.    Moreover, on March 18, 1994, Mr. Laughren filed an affidavit, which confirmed that the PTW Closing was completed on January 4, 1993.

370.    In addition, on January 14, 1993, Ahern wrote a letter "to whom it may concern", confirming that the Laughrens were in possession of the deed and title to the Cove Road House on January 4.

371.    Therefore, at 5:00 p.m. on January 4, 1993, the Laughrens possessed and owned the deeds both to PTW and the Cove Road House.

372.    The Laughrens also obtained homestead protection for the Cove Road House by utilizing Plaintiffs' money to which they

- 42 -

had no legal entitlement **unless** and until the PTW Closing took place.

373.      The effect of the Laughrens utilizing Plaintiffs' money to purchase the Cove Road House, and to obtain homestead protection thereby, was to fraudulently place the Cove Road House beyond the reach of future creditors including Plaintiffs.

374.      Moreover, the Laughrens' fraud and conspiracy to defraud were confirmed in the St. Johns County Circuit Court's January 20, 1998 order granting Plaintiffs' motion for default against the Laughrens.

375.      Thereafter, on April 29, 1998, the St. Johns County Circuit Court entered a final judgment of $350,090.07 in Plaintiffs' favor and against the Laughrens.

376.      However, on June 7, 1996, the Laughrens filed a Chapter 13 bankruptcy.

377.      Following Simpson's adjournment of the PTW Closing, Ahern arranged for one Richard Taylor to perform the WDO Inspection of PTW.

378.      Taylor's WDO Inspection disclosed WDO damage in PTW.

379.      Taylor furnished his report to Ahern.

380.      On January 5, 1993, following the WDO Inspection, the Laughrens concealed the WDO damage in PTW with masking tape and paint.

381.      Taylor provided Ahern a false WDO clearance letter for PTW.

382.      On January 5, 1993, Simpson arranged for one David

- 43 -

Honrath to inspect the WDO "repairs" to PTW.

383.     On January 5, 1993, Honrath provided Simpson a false WDO clearance letter for PTW, saying all damage found had been repaired.

384.     However, Honrath also provided Simpson a rider:

> To treat the Eastern Subterranean termites at the above location, with a repair warranty the cost would be $975.00 with the renewals of $150.00.

385.     Therefore, Honrath both affirmed that there was no current WDO damage to PTW, while at the same time estimating the cost to repair same.

386.     Most significantly, Honrath's rider was provided to Simpson, Plaintiffs' attorney, prior to Simpson informing Ahern that, based on the second WDO report, certified termite and pest control report, Ahern was authorized to release the [PTW] closing documents for recording and to disperse the closing proceeds from escrow.

387.     On February 18, 1993, some six weeks after the Taylor and Honrath WDO Inspections, a WDO Inspection was performed on PTW by one Peter Powell of Bob Adams & Associates, American Society of Home Inspectors, as part of a detailed home survey/inspection, resulting in a comprehensive thirty-five (35) page colored report (hereafter the "Powell PTW Report").

388.     The Powell PTW Report found serious damage, and stated, in pertinent part:

> You stated a WDO Inspection was done within days before closing and that all defects found

- 44 -

were repaired just before closing.  I must
then assume that the rot and bug damage list
in the previous pages of this report was not
discovered by the WDO Inspector, and as such
his inspection and report were flawed.  It is
my opinion that all of the rot/bug damage
found today would have been present during at
least the last few months, and that these
defects should have been found.

389.     The Powell PTW Report revealed that the cost to repair/replace only those items that the home inspector was qualified to address amounted to forty-thousand dollars ($40,000).

390.     Powell advised Plaintiffs to have a complete structural survey performed on PTW, to determine whether there were defects which he was not professionally qualified to address.

391.     Powell further advised Plaintiffs to contact St. Johns County Building and Codes Department to determine the extent of the building and safety code violations which he had noticed during his inspection.

392.     A WDO Inspection performed on PTW on November 17, 1993 by Florida Pest Control and Chemical Company found visible evidence of "old house borers" (termites) in those same areas that Taylor, Honrath, and Powell had found.

393.     Plaintiffs thus believe that the Taylor and Honrath false WDO clearance letters for PTW were designed to prevent Plaintiffs from canceling the Ahern PTW Contract.

394.     If Plaintiffs had cancelled the Ahern PTW Contract prior to the PTW Closing, Plaintiffs would have learned that, with the assistance of Simpson and Ahern, the Laughrens had utilized Plaintiffs' money to: (1) pay off the $84,000 Laughren PTW

- 45 -

Mortgage; (2) pay $102,000 for the Cove Road House; and, (3) pay a total of $20,600 in real estate commissions to Arvida and Stockton.

395.     After 6:00 p.m. on January 5, 1993, Simpson telephoned Plaintiffs and informed them the PTW Closing had taken place without them, Plaintiffs, being present, and that Plaintiffs now owned PTW.

396.     The closing statement dated January 5, 1993 is not signed by Plaintiffs.

397.     On January 6, 1993, Plaintiffs first inspected PTW.

398.     Plaintiffs were horrified to find dog feces all over the house.

399.     Plaintiffs were also horrified to find the following items to be inoperable and/or defective: (1) domestic electrical appliances; (2) heating, ventilation and air conditioning (HVAC); and, (3) plumbing.

400.     The referenced items are some of the specific items Plaintiffs had demanded Simpson have inspected in their April 10, 1992 and April 14, 1992 letters to Simpson.

401.     Plaintiffs also discovered that the personal property they had purchased from the Laughrens for $18,000 was worth much less.

402.     In fact, on or about January 1994, Plaintiffs arranged for Murray-Brandenberger, valuers and auctioneers, to appraise the personal property and remove same for auction.

403.     The auction of the personal property recouped a total of only about three thousand dollars ($3,000) of the eighteen

- 46 -

thousand dollars ($18,000) Plaintiffs had paid.

404.     Plaintiffs immediately telephoned Simpson about the foregoing.

405.     Simpson told Plaintiffs these systems had been in excellent condition when he had PTW inspected.

406.     Simpson told Plaintiffs to complain to both Arvida and Stockton because it was Arvida's and Stockton's responsibility to ensure the Laughrens handed PTW over to Plaintiffs in the same excellent "As Is" condition which was stipulated to in the Ahern PTW Contract.

407.     Plaintiffs complained to Stockton, which passed their complaints on to Arvida, the listing broker.

408.     On January 6, 1993, Plaintiffs showed Reesh, of Arvida, the filthy and defective condition of PTW.

409.     Arvida arranged for Hermon Multiple Services, an industrial cleaning company, to clean PTW.

410.     Arvida told Plaintiffs that the defective condition of PTW was Simpson's responsibility.

411.     On January 8, 1993, Hermon Multiple Services exposed many other defects in PTW, which had been concealed, including: (1) packing boxes had been placed in front of an interior wall to conceal water damage; (2) holes between the wall(s) and window frame(s) where the window blinds had been affixed to the frames so the damage to the window frames, glass, and seals could not be seen; (3) the jackets round the two water heaters had been spray painted over to conceal the rust underneath; (4) the damaged

- 47 -

condition of the furniture and other personal property; (5) dirty diapers between the cushions in the furniture; (6) dirty underwear wrapped around the pipes to absorb the water leaks; (7) the kitchen waste disposal had been painted with numerous coats of red paint to prevent it from falling off and to conceal the rust; (8) the crack in the foundation of the concrete floor of the entire house; (9) sewage water leaking through a downstairs light fitting; (10) duct tape affixed over the rot and bug damage to window frames, base boards, door frames, and exterior wood siding; (11) paint over the duct tape to match the applicable decor so that the duct tape would not be noticeable.

412.     On January 8, 1993, Mr. Stirzaker telephoned Simpson to ask if they had any recourse in law against the Laughrens.

413.     Simpson told Mr. Stirzaker:

> No.  You will just have to grin and bear it, Stanley.  Turn the other cheek and accept the situation.

414.     Beginning on January 8, 1993, Plaintiffs began arranging for local contractors to estimate the cost to repair/replace the defects in PTW; specifically: (1) Ocean State (HVAC); (2) C&M Electrics; (3) Schultz Roofing; (4) Jax Beach glass (windows).

415.     Plaintiffs learned that some of these contractors had previously given the Laughrens estimates to repair/replace the defects in PTW, specifically: (1) Ocean State (HVAC); and, (2) Schultz Roofing.

416.     Plaintiffs believe that the Laughrens used the

- 48 -

referenced repair/replacement estimates in order to conceal the defects from prospective buyers, including Plaintiffs.

417.     In January and February of 1993, Plaintiffs kept Simpson informed, on a daily basis, of the results of the individual professional contractors' inspections of PTW and the concomitant estimates to repair/replace the defects.

418.     Simpson told Plaintiffs:

> That's it.   They knew.   Rescission of contract.

419.     As a result of the numerous defects and the overall condition of PTW, PTW was uninhabitable.

420.     Plaintiffs lodged with friends until they could obtain, at their cost, a rental condominium.

421.     Initially, Simpson told Plaintiffs:

> You have been screwed.  You were two patsies out of England.  I would not trust the Laughrens as far as I can throw the building we are sitting on.

422.     However, on February 11, 1993, Simpson wrote to the Laughrens informing them of the concealed defects in PTW.

423.     Simpson advised Plaintiffs that, if they sought to rescind the Ahern PTW Contract, Plaintiffs would have to remove all their personal property and effects from PTW at short notice (their United Kingdom personal property including furniture had been shipped to Florida and was being stored at PTW).

424.     For that alleged reason, Simpson advised Plaintiffs to purchase an alternative property as soon as possible.

425.     Acting on Simpson's advice, and still trusting him,

- 49 -

Plaintiffs located what they believed to be a suitable new property at 8997 Lake Kathryn Drive, Sawgrass Country Club (hereafter the "Lake Kathryn House").

426.      Plaintiffs were provided a standard form contract on the Lake Kathryn House (hereafter the "Proposed Lake Kathryn Contract").

427.      Plaintiffs immediately took the Proposed Lake Kathryn Contract to Simpson for him to research the builder, Richard Clayton Rogers, Jr., d/b/a Shelter Contractors (hereafter the "Builder") and the property.

428.      Simpson kept the Proposed Lake Kathryn Contract for several days, ostensibly to research the Builder and the property.

429.      Simpson hand wrote an additional provision to the Proposed Lake Kathryn Contract to the effect that the fifteen thousand dollar ($15,000) deposit demanded by the Builder was to be refunded if the Ahern PTW Contract was not rescinded within ninety (90) days.

430.      Simpson failed to require that Plaintiffs' $15,000 deposit on the Lake Kathryn House be held in escrow.

431.      Simpson failed to research the Builder or the property.

432.      If Simpson had researched the Builder and the property, he would have discovered that: (1) the Builder was in Chapter 11 bankruptcy; (2) the Lake Kathryn House was encumbered by mechanics liens; and, (3) the mortgage company which held the mortgage on the Lake Kathryn House had commenced foreclosure

proceedings against the Builder.

433.     Due to the Builder's financial situation, the Builder's bank would allow the Builder to deposit Plaintiffs' $15,000 check, but would not permit withdrawal thereon.

434.     The Builder then went to Plaintiffs' bank, which exchanged Plaintiffs' $15,000 refundable deposit check for a $15,000 cashier's check, which the Builder then dissipated.

435.     As a direct result of Simpson's foregoing failures, Plaintiffs lost their $15,000 deposit on the Lake Kathryn House.

436.     On March 4, 1993, Plaintiffs wrote to Simpson terminating Simpson's representation of them.

437.     Plaintiffs told Simpson they did not believe he had given them the full support of Florida law either before or since the PTW Closing.

438.     Plaintiffs asked Simpson for the contents of their file.

439.     Despite repeated requests to Simpson, Plaintiffs did not gain access to the contents of their file until three years later, during Simpson's May 15, 1996 deposition.

440.     Moreover, prior to May 15, 1996, Simpson concealed and/or destroyed portions of Plaintiffs' file.

441.     From March 4, 1993 through March 8, 1993, Plaintiffs tried repeatedly and unsuccessfully to retain another Jacksonville attorney to take their case to sue for rescission of the Ahern PTW Contract and for damages.

442.     Plaintiffs contacted several local attorneys, each

- 51 -

of which advised Plaintiffs that Simpson bore the greatest responsibility for their financial losses.

443.    At least six (6) Jacksonville attorneys told Plaintiffs that neither they nor any other Jacksonville attorney would sue Simpson.

444.    On March 8, 1993, desperate to recover the losses they had incurred, and because Simpson had told them he would rescind the Ahern PTW Contract, Plaintiffs rehired Simpson.

445.    Plaintiffs sought to pursue their claims against the Laughrens, Ahern, Arvida, and Stockton.

446.    Simpson refused to sue Ahern and told Plaintiffs they would have to retain someone else to "go after Ahern".

447.    On March 8, 1993, Plaintiffs gave Simpson the original Powell PTW Report and instructed Simpson to rescind the Ahern PTW Contract.

448.    Simpson approached the various parties responsible for Plaintiffs' damages: (1) the Laughrens; (2) Arvida; and, (3) Stockton, and advised that Plaintiffs would seek legal redress if necessary.

449.    On March 15, 1993, Ahern's partner, Robert B. Persons, Jr. (hereafter "Persons"), sent a letter to Plaintiffs via Simpson threatening to countersue Plaintiffs.

450.    Persons also stated that:

> It is apparent that all of the alleged "defects" decried by your clients are palpably patent, not latent. The subject dwelling house was, of course, over thirteen years old at time of sale, and your clients had overly

- 52 -

ample opportunity to observe <u>all of the minute</u>
<u>nits</u> at which they now pick.

(emphasis added).

451.     On March 31, 1993, Ahern wrote to Simpson disclaiming any liability for Plaintiffs' losses associated with the PTW transaction.

452.     On or about April 10, 1993, Plaintiffs met with Simpson and his partner, Thomas Copeland, in Simpson's office at Simpson's request.

453.     Simpson and Copeland threatened Plaintiffs with a large retainer and a seven (7) year lawsuit that Plaintiffs had little or no chance of winning if they continued to seek rescission of the Ahern PTW Contract and damages.

454.     On April 19, 1993, acting on the advice of a number of real estate lawyers, Plaintiffs filed complaints against Simpson and Ahern with the Florida Bar.

455.     Subsequently, Plaintiffs obtained the numerous (approximately thirty) St. Johns County Building and Codes Department "Rejection for Building Code Violation" notices which had been posted on PTW between 1980 and 1985.

456.     Plaintiffs also learned that St. Johns County had reduced the assessed valuation of PTW by sixty-nine thousand dollars ($69,000) from two hundred seventy-seven thousand one hundred twenty ($277,120) to two hundred eight thousand one hundred twenty $208,720, due to the one thousand two hundred ten (1,210) square foot addition to PTW constructed, contrary to building code

- 53 -

standards, by Mr. Laughren in 1985.

457.     In May 1993, Plaintiffs consulted with attorneys David B. Lee, Jr. and Borden Hallowes from Clay County.

458.     Hallowes arranged for John Adcox, Professor of Structural Engineering at the University of North Florida and president of Adcox Construction Company, Inc., to perform a structural survey on PTW.

459.     Professor Adcox hired subcontractors from outside of the Jacksonville area to inspect PTW.

460.     Professor Adcox's structural survey report (hereafter the "Adcox Report") stated that:

> the house has so many problems that we have
> addressed them in the estimate.  I have not
> listed all of the items in this report.  This
> house appears to have had no maintenance since
> it was constructed, resulting in a house that
> is in extremely poor condition and barely
> usable.

461.     The Adcox Report estimated the total cost to repair PTW at one hundred eleven thousand, six hundred seven dollars ($111,607).

462.     This amount did not include correcting all the building and safety code violations.

463.     Plaintiffs paid $299,000 for PTW, plus $18,000 for the personal property, for which they recovered about $3,000.

464.     On April 16, 1993, PTW was appraised at $240,000.

465.     Therefore, Plaintiffs could not afford to repair PTW, pay the mortgages, and live in PTW.

466.     As a result, Plaintiffs later sold PTW.

- 54 -

467.     On June 14, 1993, Hallowes wrote to Simpson, Ahern, the Laughrens, Arvida, and Stockton, giving them ten (10) days to settle without litigation.

468.     Hallowes advised that all Plaintiffs wanted was to be made whole.

469.     As a result of their representation of Plaintiffs, Hallowes and Lee received threatening letters and telephone messages about consequences to them, Hallowes and Lee, if they continued to represent Plaintiffs.

470.     At 5:00 p.m. on June 29, 1993, the Laughrens filed a foreclosure action against Plaintiffs and PTW.

471.     The Laughren Purchase Money Mortgage was incorrectly dated January 4, 1993, rather than January 5, 1993, the date when the PTW deed was delivered.

472.     The Laughren Purchase Money Mortgage should have reflected a January 5, 1993 execution date in accordance with the closing of the PTW transaction, exemplified by delivery of the PTW deed, which took place January 5, 1993.

473.     However, Ahern's office diary entry of June 15, 1993, reflects that the Laughren Purchase Money Mortgage commenced January 4, 1993.

474.     The Laughrens' foreclosure action, and accompanying *lis pendens*, was thus improper, since Plaintiffs' payment on the Laughren Purchase Money Mortgage was not due until 5:00 p.m. June 30, 1993.

475.     Shortly thereafter, suit was filed on Plaintiffs'

- 55 -

behalf against: (1) Simpson, for legal malpractice; and against:
(2) the Laughrens; (3) **Arvida**; (4) Stockton; and, (5) Ahern,
alleging fraud, misrepresentation, conspiracy to defraud.

# Howard & Associates,
## Attorneys at Law, P.A.

215 South Monroe Street, Suite 618                                    Telephone: 904/222-2399
Tallahassee, Florida 32301-6301                                       Telecopy: 904/222-6956

### <u>R E C E I P T</u>

Received this _18th_ day of _Jan_____, 1996, from _Stringler_____
the amount of Twenty-Five and no/100 dollars ($25.00) in payment of the Lawyer Referral Fee.

**EXHIBIT**

"B"

## AUTHORITY TO REPRESENT

The undersigned client hereby retains and employs Howard & Associates, Attorneys at Law, P.A., as his/her/their attorney to represent him/her/them in a claim for _Mr. & Mrs._ _Stingaker_____, against _Attorney Engine_____, or any other person, firm or corporation liable therefore, resulting from _Legal malpractice_ _____ that occurred on or about _1142 -_____, 19 _94_, at _Jacksonville, FL_____.

The client hereby agrees to pay for the costs of this claim, including, but not limited to, copying charges of $ .25 per page, telephone charges, facsimile charges of $3.00 for the first page, and $1.00 for each additional page, postage, express delivery charges, transcript charges, travel, expert witness charges, deposition charges, filing fees, summons and service of process fees, investigation, and other out of pocket costs. As compensation for his services, the client agrees to pay said attorney, the following fee: _a minimum of $300 a_ _month plus Costs_____ Hourly Rate: $ _$300_.

It is agreed and understood that the attorney may withhold and pay from the proceeds of recovery any and all costs of investigation, court costs, and costs of securing evidence, including expert testimony, and, at his option, may withhold and pay from the proceeds of recovery any and all medical, hospital, and other bills and charges which are unpaid or unreimbursed, prior to paying the balance of the recovery to the client. The client certifies that he has employed no other attorney or counsel in this matter.

The undersigned client has, before signing this contract, received and read the Statement of Client's Rights, and understands each of the rights set forth therein. The undersigned client has signed the statement and received a signed copy to keep to refer to while being represented by the undersigned attorney(s).

This contract may be canceled by written notification to the attorney at any time within three (3) business days of the date the contract was signed, as shown below, and if canceled, the client shall not be obligated to pay any fees to the attorney for the work performed during that time. If the attorney has advanced funds to others in representation of the client, the attorney is entitled to be reimbursed for such amounts as they have been reasonable advanced on behalf of the client.

Dated at Tallahassee, Leon County, Florida, this _10th_ day of _January_____, 19 _96_.

_S. Stingaker & h.B. Snyder_____
Client's signature
Printed Name: _S. STIRZAKER_.

The above employment is hereby accepted upon the terms stated.

Howard & Associates,
Attorneys at Law, P.A.

_Jns How_____
P. Tim Howard
For the Firm

## FEE AGREEMENT

We, Stanley and Norma Stirzaker (hereinafter "the client") employ Howard & Associates, Attorneys at Law, P.A., (hereinafter "the attorneys") as our attorneys to represent us in our claim for damages arising out of legal malpractice; Date of Incident: 1993-1994.

### I. CONTINGENT FEE, COURT AWARDED OR BILLED FEES AND COSTS.

The client agrees to pay the attorneys the following attorneys' fee based upon the total recovery.

1.  Unless otherwise provided below:

    a.  33⅓% of any recovery up to $1 million through the time an answer to the lawsuit is filed or arbitration is demanded;

    b.  40% of any recovery up to $1 million from the time an answer to the lawsuit is filed or arbitration is demanded through the entry of judgment;

    c.  30% of any recovery between $1-$2 million form the time an answer to the lawsuit is filed or arbitration is demanded through the entry of judgment; and

    d.  20% of any recovery in excess of $2 million from the time an answer to the lawsuit is filed or arbitration is demanded through the entry of judgment.

2.  If all defendants admit liability at the time of filing an answer to the lawsuit and request a trial or arbitration only on the amount of damages:

    a.  33⅓% of any recovery up to $1 million through entry of judgment;

    b.  20% of any recovery between $1-$2 million;

    c.  15% of any recovery in excess of $2 million.

3.  An additional 5% of any recovery if an appeal is taken or post-judgment relief or action is required fro recovery on the judgment.

4.      If the case is settled by periodic payments, the contingent fee percentage will be calculated on the cost of the structured settlement or, if the cost is unknown, on the present money value of the structured settlement, whichever is less.

5.      If the event that fees are recovered in this action from any adverse party, this contract is not to be construed as a limitation on the maximum reasonable fee to be awarded to the attorneys by the Court.  Any fees awarded by the Court and paid by a defendant will be credited against the sums due from the client and any excess will be retained by the attorneys.

6.      If it is determined that one or more of the responsible parties is a governmental agency and that the recovery and/or attorneys' fees are limited by law against the party, it is understood that the attorneys' fee on account of the recovery from that party shall be the amount provided by law.

7.      In cases involving a claim of wrongful death or injury to a minor child, the law may require that a probate or guardianship proceeding be instituted.  Legal services for probate and guardianship proceedings are not included within the terms of this contingency agreement. If necessary, such services will be arranged and if paid for by the attorneys the expense will be treated as a cost.

8.  If the court awards attorneys' fees and court costs, or if the billed hourly rate of $200 per hour plus costs is higher, the attorneys shall be entitled to either the contingency fee, the court awarded attorneys' fees and costs, or the billed attorneys' fees and costs, whichever is more (less the amounts already paid to this firm by the client in fees in costs).

2

## II. COSTS.

The client will be responsible for all costs.

## III. TERMINATION.

The contract may be cancelled by written notification to the attorneys at any time within three (3) business days of the date the contract was signed, as show on in this contract. If properly cancelled the client shall not be obligated to pay any fees to t he attorneys for the work performed during that time. If the attorneys have advanced funds to others in representation of the client, the attorneys are entitled to be reimbursed for such amounts as they have reasonably advanced on behalf of the client.

If the client terminates this agreement after three business days, the client will be obligated to pay all costs and expenses incurred by the attorneys, and must, in addition, pay from the proceeds of any recovery the reasonable value of services provided by the firm.

The attorneys reserve the right to withdraw from the case.

## IV. STATEMENT OF RIGHTS.

The undersigned client has, before signing this contract, received and read The Statement of Client's Rights, and understands each of the rights set forth therein. The undersigned client has signed the statement and received a signed copy to keep and to refer to while being represented by the undersigned attorneys.

If two law firms are named above, the client agrees that the attorneys' fee will be shared between the firms. Both firms are available and responsible to the client for consultation. The association of these firms has been discussed and approved by the client.

3

Upon conclusion of the claim, Howard & Associates, Attorneys at Law, P.A., will

provide the client with a closing statement listing all of the financial details of the case, including

the amount recovered, all expenses and a precise statement of attorneys' fees.

## V. SIGNATURE OF THE PARTIES.

We agree to employ the above-named attorneys. This contract contains our entire

agreement and is not valid unless signed by all parties. We have received a copy.

_____                    _____
Client's signature                             Client's signature
Date:_____1/18/96_____                     Date:_____


_____
Client's signature
Date:_____1/18/96

Employment is accepted on the foregoing terms.

HOWARD & ASSOCIATES,
ATTORNEYS AT LAW, P.A.

By:_____
     For the Firm
Dated:___1/18/96_____

4

# Howard & Associates,
## Attorneys at Law, P.A.

215 South Monroe Street, Suite 618                          Telephone: 904/222-2399
Tallahassee, Florida 32301                                   Telecopy: 904/222-6956

February 14, 1996

Stanley and Norma Stirzaker
900 Ironwood Drive, Apartment 922
Ponta Vedra Beach, Florida 32082

Re: Legal Malpractice Action, Trust Account, Fee Agreement.

Dear Mr. and Mrs. Stirzaker:

     We are still awaiting receipt of your documents and summary to further our work on your case. We also happily wish to verify receipt and deposit into the trust account of Howard & Associates, P.A. of $39,467.35 as a result of Judge Watson's Order. In light of the availability of funds for fee payment, an amended representation agreement is proposed:

     Instead of the standard hourly rate of $250, or your currently discounted hourly rate of $200, your hourly rate would be reduced by 40% from the standard rate, and 25% from your current discounted rate to $150 an hour plus costs for my time. Your discount would be 60% for the time of Paul Chmielewski, or $100 an hour plus costs. Moreover, you would be relieved of the $300 a month plus costs minimum payment for the balance of a retainer, but the minimum payment would be reinstated if the litigation extends beyond the retainer amount. The retainer would consist of a $5,000 non-refundable retainer to be billed against the time and costs spent on the case; and a $10,000 retainer to be billed based on the time and costs spent on the case with any remaining funds to be returned to yourself. We are further discounting our hourly fee up to 60% of our standard hourly rate based upon the assurance of payment found within the retainer agreement.



EXHIBIT

"C"

Page 2
Stanley and Norma Stirzaker
February 14, 1996

This amended fee agreement significantly reduces our hourly rate thereby giving you more value for our time, while at the same time in exchange the firm is assured payment for its work. If this amended representation agreement is acceptable, please sign and date both copies of this letter below, and return one of the originals to our office and it will be incorporated into our January 18, 1996 agreement.

Sincerely yours,

P. Tim Howard
For the Firm


_____   _____          _____   _____
STANLEY STIRZAKER     DATE                 NORMA STIRZAKER      DATE